*In re* WILLIAMS

Docket No. 289260. Submitted June 2, 2009, at Lansing. Decided November 24, 2009, at 9:10 a.m.

The Department of Human Services petitioned the Berrien Circuit Court, Family Division, for orders granting the petitioner temporary and permanent custody of Makyla Williams, the minor daughter of respondents, Michael Williams, Sr., and Lashawnda Masjay Wright, and terminating the respondents' parental rights. Following proceedings conducted by a referee, the court, Thomas E. Nelson, J., entered an order terminating the respondents' parental rights and granting custody of the child to the petitioner. The respondents appealed.

The Court of Appeals *held*:

1. Clear and convincing evidence supported the determination to terminate the parental rights of the respondent mother on the bases of her longstanding drug addiction, her persistent inability to complete a drug treatment program, and her lack of housing and employment. The evidence showed that the mother's problems will not be rectified within a reasonable time considering the child's age. The part of the order terminating the respondent mother's parental rights must be affirmed.

2. The respondent father, for the first four months of the proceedings, did not qualify as a "respondent" who, if indigent, had the right to court-appointed counsel, because the petitions contained no allegations of wrongdoing against him. It was not until the petitioner filed the supplemental petition that it identified an act or omission that converted the father's status from that of a nonoffending parent into that of a "respondent." A permanency planning hearing was then conducted without informing the respondent father of his right to appointed counsel. The father then requested court-appointed counsel at the termination hearing, however, the referee erred in determining at the hearing that the father did not qualify for appointed counsel. The referee erred in imputing to the father income earned by his mother and father, with whom he lived, who have no legal responsibility to contribute to the respondent father's legal expenses. A court may not prohibit a respondent from exercising the right to appointed counsel on the

basis of a calculation that imputes income from sources unavailable to the respondent. The referee erred in rejecting the respondent father's request for appointed counsel at the termination hearing under the circumstances of this case. It was not harmless error to fail to inform the respondent father at the permanency planning hearing about his right to counsel or to refuse to appoint counsel at the termination hearing. These plain errors affected the fundamental fairness of the proceedings and the father's substantial rights. The part of the order terminating the respondent father's parental rights must be reversed and the case must be remanded for further proceedings.

Affirmed in part, reversed in part, and remanded.

GLEICHER, J., concurring, agreed with the result reached by the majority but wrote separately to express her belief that the respondent father's right to appointed counsel attached at the outset of the proceedings rather than when the petitioner filed the supplemental petition identifying him as a respondent. Fundamental due process principles required that the referee offer the respondent father court-appointed counsel in accordance with MCR 3.915(B)(1) when the respondent father was first deprived of the custody of his child. The deprivation of counsel was highly prejudicial to the respondent father in this case. Child protective proceedings that divest a nonoffending parent of his or her child's custody implicate the due process liberty interest in caring for the child, regardless of whether the petitioner has formally identified the parent as a respondent. The process due when a court deprives a nonoffending parent of his or her child's custody should be determined by balancing three factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional or substitute procedural safeguards; third, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. An application of these factors in this case compels the conclusion that the referee should have offered the respondent father appointed counsel at the adjudication trial and at every hearing conducted thereafter. The error was not harmless.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — RIGHT TO COUNSEL.

The United States Constitution guarantees a right to counsel in parental rights termination cases; the constitutional concepts of due process and equal protection grant respondents in termination proceedings the right to counsel; the constitutional right of due

process confers on indigent parents the right to appointed counsel at hearings that may involve the termination of their parental rights.

2. PARENT AND CHILD — CHILD PROTECTIVE PROCEEDINGS — INDIGENTS — RIGHT TO APPOINTED COUNSEL — IMPUTED INCOME.

A court may not deny appointed counsel to a respondent in child protective proceedings by imputing to the respondent income earned by people who bear no legal responsibility to contribute to the respondent's legal expenses; mere cohabitants, even if parents of an adult respondent, possess no obligation to pay a respondent's attorney fees; a court may not prohibit a respondent from exercising the right to appointed counsel on the basis of a calculation that imputes income from sources unavailable to the respondent (MCL 712A.17c[4] and [5]; MCR 3.915[B][1]).

*Norm R. Perry* for Lashawnda Masjay Wright and Michael Williams, Sr.

Before: OWENS, P.J., and SERVITTO and GLEICHER, JJ.

PER CURIAM. Respondents appeal as of right a circuit court order terminating their parental rights. We affirm regarding Lashawnda M. Wright, respondent mother, reverse with respect to Michael Williams, Sr., respondent father, and remand for further proceedings concerning respondent father. We have decided this case without oral argument pursuant to MCR 7.214(E).

I. FACTUAL AND PROCEDURAL HISTORY

Respondents are the parents of Makyla Williams, who was born on December 7, 2007.[1] At the time of Makyla's birth, respondent mother resided in Odyssey House, a residential substance abuse treatment center

---

[1] Respondents are also the parents of Michael Williams, Jr., born January 18, 2007. The circuit court terminated respondents' parental rights to Michael in October 2008, and this Court affirmed. *In re Williams*, unpublished opinion per curiam of the Court of Appeals, issued April 28, 2009 (Docket Nos. 288260, 288304).

in Flint. Respondent mother withdrew from Odyssey House on February 1, 2008, before completing her treatment. She returned to Berrien County with two-month-old Makyla, and enrolled in an intensive outpatient treatment program at the Community Healing Center. For approximately six weeks, respondent mother complied with the requirements imposed by the intensive outpatient program.

In March 2008, Children's Protective Services (CPS) received information that respondent mother had prematurely ceased her outpatient substance abuse treatment and renewed her habitual use of crack cocaine and marijuana. On March 13, 2008, petitioner, Department of Human Services (DHS), filed a petition seeking temporary custody of Makyla. The petition contained no substantive allegations about respondent father.[2] A circuit court referee authorized the petition and ordered Makyla placed in foster care. The parties have not provided this Court with the transcript of the March 13, 2008, preliminary hearing, and it is uncertain whether respondent father attended. The circuit court record reflects that respondent mother appeared and requested appointed counsel, and that the court appointed counsel for her.

Petitioner filed an amended petition on March 24, 2008, containing greater detail regarding respondent mother's substance abuse history. The amended petition recited that respondent father "is the legal father of Makyla," but contained no allegations that respon-

---

[2] The petition's sole reference to respondent father averred:

An attempt was made to conduct a home visit on 3/12/08. The Petitioner spoke with Cecil Davis, Lashanda's [sic] grandfather who stated that Lashanda [sic] and the baby had just left with Michael Williams. The Petitioner left a card with Mr. Davis and requested he have Lashanda [sic] call.

dent father had neglected or abused Makyla or lacked the capacity to care for her.

On May 7, 2008, a circuit court referee conducted a bench adjudication trial. Respondent mother did not attend the trial, but was represented by counsel. The referee preliminarily observed with respect to respondent father, "Mr. Williams, you are here without counsel. It's my understanding that you're going to represent yourself?" Respondent father replied affirmatively, and the following colloquy ensued:

> *The Referee*: Okay. And you understand that you have the right to do that?
>
> *Respondent Father*: Yes.
>
> *The Referee*: And you also understand that the same rules and regulations apply whether you have counsel or not? So you still have to comply with the same laws and rules. You understand that, sir?
>
> *Respondent Father*: Yes.
>
> *The Referee*: All right. And we'll go ahead and proceed because notice is proper.

The prosecutor called respondent father as her first witness. Respondent father testified that he lived with his mother, received social security disability income for a disease that he described as "a spot on my lung," and earned additional income doing "odds and ends." Respondent father agreed that respondent mother had a "very unstable" lifestyle and lacked housing and a source of income. In response to questions posed by the referee, respondent father explained that he spent time with Makyla every day, fed her, and changed her diapers. Respondent father volunteered that he had given respondent mother money to prevent her from "end[ing] up in the streets."

A supervisor and therapist at the Community Healing Center testified that respondent mother continued to abuse crack cocaine, marijuana, and alcohol, and failed to successfully complete the intensive outpatient treatment program. Amanda Forrester, Makyla's foster care worker, recounted that in March 2008 respondent mother had admitted regularly using cocaine and marijuana, and Forrester stated that services had been offered to respondent mother. Neither respondent presented any evidence.

The prosecutor requested that the court find "that there's a preponderance of evidence that the mother has neglected the child and the child's at risk in her care, and that the father's not in a position to be able to provide for the child on his own." Respondent father argued:

> Your honor, I haven't—my condition and whatever is wrong with me, there's a lot of people a lot sicker than me that have custody of their children like this. And I take care of little June, I take care of little Mike, and I take care of her too. I stay up, I watch her, change their diapers, feed them three or four, five o'clock in the morning. . . .
>
> And my physical problem does not prevent me from not taking—from not taking care of them. I take care of them. I feed them. I buy them [P]ampers. I buy whatever they need, milk and everything. I support them.

The referee determined that Makyla came within the court's jurisdiction, finding that "transferring this child back to the home of either parent would be inappropriate and would potentially cause more harm than any good that can come of it." After the referee announced his ruling, respondent father objected, "I don't see why I can't have temporary custody of them because I don't smoke drugs, I do not do drugs. I'm at home with them."

The referee proceeded to conduct a dispositional hearing. Forrester recommended that Makyla remain in

placement with respondent father's sister, and responded as follows to questions posed by the prosecutor:

*Q.* And this is Mr. Williams Senior's sister?

*A.* Yes.

*Q.* That gives him pretty good access to his child?

*A.* Yes. It does. Michael Senior's mother provides daycare for the child during the time and she lives in the same home as Michael, Senior. So he does have that—liberal access to the child.

*Q.* And in terms of Mr. Williams, he's a pretty nice guy?

*A.* Yes. He is.

*Q.* He's been very consistent in caring for his children and being involved?

*A.* Yes.

*Q.* He wants to be involved with his children's lives?

*A.* Yes.

*Q.* And he actually visits and spends as much time as possible with them. Is that correct?

*A.* As far as I know. Yes.

Forrester then described that "about a year ago" she received a "form" from respondent father's physician "basically stating that Mr. Williams needs help with shopping, laundry, meal preparation, some basic chores." At the bottom of the form, Forrester had inquired of the physician, "Does this patient's medical condition keep him from being able to parent/raise a 4-month old child until he is an adult?" The physician wrote, "Yes," and underlined it. Forrester advised that respondent father willingly signed two additional medical releases, but despite her efforts the physician had yet to supply her with additional information. Forrester asserted that she wanted the physician to elaborate and admitted that she saw no reason why respondent father

could not provide care "with the assistance of his family members[.]" According to Forrester, petitioner had neither offered nor provided any services to respondent father, apart from a parenting class that respondent father successfully completed in the course of the child protective proceeding regarding Michael, Jr. Forrester recommended only that respondent father maintain contact with Makyla. Regarding respondent mother, Forrester recommended substance abuse treatment followed by individual counseling, a parenting class, and weekly parenting time.

The prosecutor sought clarification of Forrester's recommendations by inquiring, "So you're not—your goal isn't to keep the children from Mr. Williams?" Forrester responded, "No. It's not." The referee addressed respondent father and highlighted that "the prosecutor and the Department of Human Services, everybody thinks that you're a pretty good dad." The referee then advised respondent father that "we want to get a handle on" any health restrictions, and that he should stop "enabling" respondent mother by giving her money. Respondent father agreed to cooperate with petitioner. The circuit court's order of May 9, 2008, afforded respondent father "liberal and frequent" parenting time "supervised by the Department of Human Services and/or its designee."

On July 30, 2008, the referee conducted a dispositional review hearing. The prosecutor noted that a termination petition had been requested "in the companion file" involving Michael, Jr.[3] The lawyer-guardian ad litem reviewed that respondent mother had missed "a signifi-

---

[3] The record provided to this Court does not include of copy of the petition regarding Michael, Jr., and we are unable to determine whether the initial petition in Michael's case sought termination of respondent father's parental rights.

cant number of drug screens," and "needs a lot of services" that she had failed to initiate. Neither the prosecutor nor the lawyer-guardian ad litem voiced any concerns about respondent father. The referee then noted that respondent father had "pulmonary sarcosis [sarcoidosis]." In response to the referee's questions, respondent father explained that he took medication and received treatment for this condition, which had remained "the same" since its original diagnosis in 1987 or 1989. The referee then spoke at length with respondent mother, and warned her that if she continued to use drugs she would lose her children. The referee opined:

> It is not appropriate to return the child to the home at this point because I'm not sure what issues the child would face based on the substance abuse.
>
> Dad's got some medical problems himself, which gives [sic] him some problems as far as becoming the custodial parent. But doesn't mean they don't need a father. You're going to continue to be the father, Mr. Williams, right?
>
> *Respondent Father*: Yes, sir.

None of the hearing participants further elaborated any concerns regarding respondent father's lung disease. But the order entered after the hearing noted concerning "likely harm to the child if the child was returned to his or her parent(s)," "Father has medical issues which prevent him from taking control of the child."

On October 6, 2008, the referee authorized petitioner to file a supplemental petition seeking permanent custody of Makyla. With regard to respondent father, the supplemental petition alleged as follows:

> Mr. Williams cannot parent one child, let alone two small children, by himself, due to health issues. He may have a kind heart but he is susceptible to the lure of his relationship with LaShawnda and has not demonstrated that he has the strength to resist what she wants even

when that is not what is best for his children or for LaShawnda. He gave her money ostensibly to prevent her from stealing or engaging in prostitution to get money for drugs. He allowed her to live in his car in his driveway instead of using that as an opportunity to go into a program by asking the worker for help. His greatest mistake was in providing Ms. Wright a means to leave her residential treatment program before she had completed it successfully and received all of the benefit that she needed to prepare herself for the next step in her recovery. There is no reason to believe he would be strong enough to resist her in the future.

On October 22, 2008, the circuit court referee conducted a permanency planning hearing regarding Makyla. The prosecutor initiated the following colloquy:

> *The Prosecutor*: Did you first want to review with Mr. Williams, even though I know he knows this, his right to have an attorney before we proceed?
>
> *The Referee*: Mr. Williams, I take it you have not hired counsel?
>
> *Respondent Father*: No. Not at the moment, your Honor.
>
> *The Referee*: Okay. And you understand that you have a right to hire counsel if you wish?
>
> *Respondent Father*: Yes.
>
> *The Referee*: And you're willing to proceed without counsel today?
>
> *Respondent Father*: Yes.
>
> *The Referee*: Okay.

Foster care worker Kanita Roseburgh testified that petitioner had pursued reasonable efforts to reunify Makyla with her parents. Roseburgh related that respondent mother had entered a residential drug treatment program, and respondent father "lives with his parents and does have a medical condition, which

prohibits him from caring for his child." According to Roseburgh, both respondents had failed to complete offered services or otherwise substantially comply with the terms and conditions of their case service plans.[4] Respondent mother testified by telephone, describing her current substance abuse treatment efforts and her commitment to remaining substance free. Respondent father offered the following statement on his own behalf:

> *Respondent Father*: They terminated my rights to my son and now they're trying to terminate my rights for my daughter. And I did everything this court asked of me to do. And I take care of them kids. I buy them stuff, whatever they need. I take their stuff right up— whatever they need I take right off the top before I do anything. And they're terminating my rights because I'm looking for LaShawnda to get better. And that's not right for them to terminate my rights for my son or my daughter.
>
> *The Referee*: Is that . . .
>
> *Respondent Father*: And I'm not—
>
> *The Referee*: —your statement, Mr. Williams?
>
> *Respondent Father*: Yeah. I'm not going to let this go neither because the prosecuting attorney—I mean, they was wrong. They didn't—they asking if I have never had no home. I never had no place to have my home because I always took care of other folk kids a long term relationship.
>
> *The Referee*: You understand, Mr. Williams, that this hearing today isn't going to terminate anything?
>
> *Respondent Father*: Right. Yes.
>
> *The Referee*: We're not going to—we're not going to do that today.

---

[4] As discussed later in this opinion, no evidence exists that respondent father failed to comply with a case service plan or failed to complete offered services.

*Respondent Father*: Right.

*The Referee*: We're only going to determine what we're going to do between now and the 12th of November.

*Respondent Father*: Yes, your Honor.

*The Referee*: Okay. And you understand the 12th of November, that's the hearing that –

*Respondent Father*: Yeah.

*The Referee*: —will decide whether or not anybody's rights are going to be terminated.

*Respondent Father*: Yes, your Honor.

The referee announced that although he continued to support his prior authorization of the supplemental permanent custody petition, "at this point I'm not changing the [reunification] plan until I hear the testimony and the evidence on the termination."

The termination hearing occurred on November 12, 2008, and respondent father almost immediately requested counsel. The following discussion ensued:

*The Referee*: Mr. Williams, any comment you wish to make?

*Respondent Father*: I want to know if I can ask the court for a court appointed lawyer on this.

*The Referee*: A court appointed lawyer?

*Respondent Father*: Yes.

*The Referee*: I don't believe you're entitled to a court appointed lawyer in this case.

Well, wait a minute. You are a respondent.

*Lawyer-Guardian Ad Litem*: I don't believe he's been screened, your Honor. We . . . we've told him in the other case and he's never had an attorney at any hearing. He's constantly reminded to be screened if he wants court appointed attorneys. He would have been told at every one of these hearings.

*The Referee*: I thought we—yeah. We discussed that I thought back in October.

But the question is, is he entitled to a court appointed lawyer?

*Lawyer-Guardian Ad Litem*: We won't know that until he's screened.

*Respondent Father*: I got screened for—I did one for Michael Junior.

*The Referee*: Did you get a court appointed lawyer?

*Respondent Father*: I guess for this pretrial.

*The Referee*: What about the termination hearing?

*Respondent Father*: That's what I meant.

*The Referee*: Pardon?

*Respondent Father*: Yes.

*The Referee*: Does 2008—

*Prosecutor*: Your Honor—

*The Referee*: —0020 indicate that there was a court appointed lawyer for Mr. Williams?

*Prosecutor*: Your Honor, I'm just looking back at 2007-0020 and the notes that I have from [prosecutor] Ms. Penninger at each of the hearings, I don't know about the orders, but the note I have from the prelim back in 2007 was over income, waived an attorney for today. I have nothing in here otherwise, other than waives attorney in a few different spots.

I think . . . at the termination hearing I have a note that Mr. Williams waived attorney. And that was a prior case.

In this file, your Honor, I have the same notes in here of the prelim it looks like, that he waived attorney. I have nothing about a court appointed attorney being in here anywhere.

*The Referee*: Well, one of the—

*Lawyer-Guardian Ad Litem*: He is the legal father.

*The Referee*: —statements in the petition is that Mr. Williams doesn't have any income.

*Lawyer-Guardian Ad Litem*: Well, but he does. He's testified in previous hearings not only does he get disability payments, but he does odd jobs on the side. Because that was one of the allegations, was that he was giving money and enabling Ms. Wright. But whether or not that puts him over income, I don't know what those standards are. He'd have to be screened.

*Prosecutor*: Your Honor, this case has been going on for almost nine months, the prior case was going on for over a year. I think that he's been adequately advised every hearing that he needs—what he would need to do. I haven't been present for those hearings. It's not my file. But I would assume from the notes and from what [Lawyer-Guardian ad Litem] Ms. Long has indicated that he has had ample opportunity to obtain counsel. And he's already been through a termination hearing so he knew what he was going into facing today.

*Lawyer-Guardian Ad Litem*: That doesn't change the fact that he's a legal father, he's a respondent, and he should at least be screened, which he can do over the phone.

*Respondent Mother's Attorney*: And on behalf of our office, your Honor, if he was screened on previous case, that doesn't necessarily mean that that would transfer over to this one. He would need to be rescreened on this one. And as Ms. Long indicated, that could be done over the phone in just a few minutes if we wanted to [sic] off the record to facilitate that.

*The Referee*: Well, again, I definitely think so because he is a respondent-father. And while I agree that, you know, it's a little late in the day, he still has a right to do it.

So we will go off the record.

*Prosecutor*: I think we should call mom back, tell her—

*The Referee*: Yeah. I think what we're going to do, Ms. Wright, we're going to disconnect the phone in a few

minutes for Mr. Williams to contact legal services to screened [sic] whether or not he's eligible for a court appointed lawyer.

\* \* \*

And then what we'll do is we'll call you back, probably in about 20 minutes to 25 minutes.

\* \* \*

Or sooner, depends on how long the screening takes. It shouldn't take much longer than that though.

\* \* \*

*The Referee*: Okay. We're back on the record in file 2008-0027-NA-N. We took a recess to determine whether or not Mr. Williams would be eligible for court appointed counsel.

Ms. Hadanek, what was [sic] the results of that?

*Respondent Mother's Attorney*: Your Honor, Mr. Williams was put through to our office by telephone. He was screened. Because he's been living with his parents since 2003 we included all household include [sic]. And he was over income at 133 percent.

*The Referee*: So he would not be eligible for court appointed lawyer?

*Respondent Mother's Attorney*: That's correct, your Honor.

*The Referee*: All right.

Mr. Williams, determination from the screening process is that you would not be entitled to court appointed lawyer. You would still be entitled if you wished to hire a lawyer, you could have done that. But you had ample opportunity in this case to do so. The record is replete with all kinds of indications to you that you had a right to do that. You waived that right. So now on the day of trial we're not

going to—we're not going to adjourn it to do so. So you're going to be representing yourself.

All right. So we will go ahead and proceed.

Malinda Bush, respondent mother's drug rehabilitation counselor, testified that respondent mother had been "in and out of treatment, engaging then disengaging, engaging then disengaging," since 2004. Bush opined that although respondent mother was doing well in her current residential treatment setting, she could not safely parent a child outside the inpatient environment.

Forrester testified that she had worked on Makyla's case until July 2008, and that she reviewed the services that petitioner had offered to both respondents since Michael, Jr., was placed in foster care in October 2007. Forrester described that respondent mother had made no progress regarding her emotional stability, neglected to participate in parenting classes, lacked housing and employment, and failed to meaningfully participate in substance abuse treatment. Forrester related that respondent father had participated in parenting and psychological assessments, completed a parenting class in January 2008, and regularly attended his parenting times. She explained that respondent father's medical condition "[i]nitially wasn't much of a concern" because she lacked information regarding the condition. Forrester continued, "However, when I received some more information from his doctor then it did become a concern." Forrester conceded that she based her conclusion regarding respondent father's health on the "form" respondent father's doctor had completed in 2007, which she previously submitted to the court.[5]

---

[5] Our careful review of the record reveals that Forrester never actually received any "more information" from respondent father's physician than the one-page form, whose contents she described at the adjudication trial.

Forrester offered that although respondent father "cares about his children," he neglected to provide medical documentation "stating that he's able to raise them," and "he's also not able to show that he has housing. So he's not able to provide for them financially." According to Forrester, "[t]hose are still concerns today." Forrester acknowledged that she had no recent information with respect to whether respondent father continued to "enable" respondent mother.

Roseburgh, the foster care specialist who assumed Forrester's duties in August 2008, testified concerning respondent father that she had requested only "adequate documentation from his doctor regarding his health," which he failed to provide. She conceded that respondent father's parents provided for his household needs. Roseburgh opined that respondent father could not safely care for Makyla "because we don't have adequate documentation from [his doctor] that says that it's okay for him to do that. So that's the big issue at this point." Roseburgh echoed Forrester's concerns that respondent father lacked "independent housing," and agreed that his income would not suffice "to help him in raising a child." With regard to respondent mother, Roseburgh expressed the same concerns as had Forrester, opining that respondent mother had made no progress in any areas of concern and lacked a relationship with Makyla.

Respondent mother testified that she continued to achieve significant gains in her therapeutic setting, and felt strongly that she could remain abstinent from alcohol and drugs and safely parent Makyla after her release from residential treatment. Respondent father testified in narrative fashion, objecting to the loss of his parental rights. He insisted that he routinely washed, fed, and dressed his children, and felt capable of taking care of them.

The referee began his bench opinion with the following summary:

> This case really does present a dilemma to me, to be honest with you. There are many, many reasons that it almost seems like a no brainer to terminate the rights of the parents. And then on the other side it seems to me that dad has been, you know, doing what he needs to be doing as far [as] he's concerned. I agree that sometimes I don't think he quite understands some of the difficulties. But that's not his fault. He didn't ask to have that pulmonary scardosis [sic], or however you pronounce it.

The referee found termination of respondent mother's parental rights to Makyla warranted pursuant to MCL 712A.19b(3)(c)(i)[the conditions leading to the adjudication continue to exist with no reasonable likelihood of rectification within a reasonable time given the child's age], (c)(ii) [the parent received recommendations to rectify other conditions and had a reasonable opportunity to do so, but failed to rectify the other conditions], (g) [irrespective of intent, the parent fails to provide proper care and custody and no reasonable likelihood exists that she might do so within a reasonable time given the child's age], and (i) [the parent had rights to a sibling of the child terminated due to serious and chronic neglect or physical or sexual abuse, and prior rehabilitation efforts have failed]. The referee invoked only subsection (g) as a ground for terminating respondent father's parental rights. The referee lastly found that termination of respondents' parental rights would serve Makyla's best interests because she apparently would have a permanent placement with a paternal aunt, an arrangement that would afford respondent father and respondent mother, if she remained sober, ongoing access to Makyla.

The circuit court adopted the referee's findings and conclusions in an order entered on November 13, 2008.

Both respondents timely sought appointed appellate counsel. The circuit court appointed the same appellate lawyer for both respondents, who now appeal as of right.

II. ISSUES PRESENTED AND ANALYSIS

A. STANDARD OF REVIEW

We review for clear error a circuit court's decision to terminate parental rights. MCR 3.977(J). The clear error standard controls our review of "both the court's decision that a ground for termination has been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest." *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). A decision qualifies as clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003). Clear error signifies a decision that strikes us as more than just maybe or probably wrong. *In re Trejo*, 462 Mich at 356. Whether a child protective proceeding complied with a respondent's right to due process presents a question of constitutional law that we review de novo. *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009).

The proof supporting a court's termination decision must qualify at least as clear and convincing. *Santosky v Kramer*, 455 US 745, 768-770; 102 S Ct 1388; 71 L Ed 2d 599 (1982). The clear and convincing evidence standard is "the most demanding standard applied in civil cases[.]" *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995). Our Supreme Court has described clear and convincing evidence as proof that

produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. [*Id.* (quotation marks and citations omitted; alteration in original).]

### B. RESPONDENT MOTHER

Respondent mother contends that insufficient evidence supported the termination of her parental rights on any statutory ground. We find that clear and convincing evidence warrants termination of respondent mother's parental rights on the basis of MCL 712A.19b(3)(c)(*i*) and (g). The conditions that led to Makyla's adjudication as a temporary court ward involved respondent mother's longstanding drug addiction, persistent inability to complete a drug treatment program, and lack of housing and employment. Although respondent mother embarked on a commendable effort to treat her addiction several months before the termination hearing, the totality of the evidence amply supports that she had not accomplished any meaningful change in the conditions existing by the time of the adjudication.

Furthermore, we detect no reasonable likelihood that respondent mother's lengthy struggle with drug addiction and her lack of employment and housing "will be rectified within a reasonable time considering the child's age." MCL 712A.19b(3)(c)(*i*). Although respondent mother appeared to be doing well in her residential program at the time of the termination hearing, our review of the testimony reveals that she would require a lengthy period of assessment, counseling, and supervision before reunification with her child could be considered. No reasonable expectation exists that re-

spondent mother could provide proper care or custody for Makyla before the child's second birthday. The circuit court correctly determined that the two years Makyla already had spent in foster care, her entire life, constituted too long a period to await the mere possibility of a radical change in respondent mother's life. The evidence detailed above also clearly and convincingly supports the circuit court's reliance on MCL 712A.19b(3)(g) as an alternate ground for terminating her parental rights.

The record does not substantiate the existence of any additional conditions causing the child to come within the court's jurisdiction, as required to terminate parental rights pursuant to MCL 712A.19b(3)(c)(*ii*). But because the evidence amply supports termination under two alternate statutory subsections, the court's invocation of subsection (c)(*ii*) qualifies as harmless error. *In re Powers Minors*, 244 Mich App 111, 118; 624 NW2d 472 (2000).

### C. RESPONDENT FATHER

Respondent father's appointed appellate counsel challenges only the sufficiency of the evidence supporting termination of his parental rights. Appellate counsel failed to raise any issue regarding his client's lack of counsel during the termination hearing, or at any point after petitioner manifested its intent to terminate respondent father's parental rights.

Only rarely will this Court consider and decide an issue not raised by the parties. Here, however, we are confronted with a circuit court order permanently severing respondent father's fundamental right to the care and custody of his child, entered after proceedings conducted without the assistance of counsel. Because we cannot ignore a process that casts serious doubt on

the integrity of the proceedings and would risk substantial injustice if allowed to stand unexamined, we turn to a detailed consideration of respondent father's right to counsel and related issues. *LME v ARS*, 261 Mich App 273, 287; 680 NW2d 902 (2004). Furthermore, "appellate courts will consider claims of constitutional error for the first time on appeal when the alleged error could have been decisive of the outcome." *People v Grant*, 445 Mich 535, 547; 520 NW2d 123 (1994). An unpreserved claim of constitutional error is reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

The underpinnings of a respondent's right to counsel in parental rights termination proceedings are statutory and constitutional. In MCL 712A.17c(4), our Legislature has mandated that in child protective proceedings,

> the court *shall* advise the respondent at the respondent's first court appearance of *all* of the following:
>
> (a) The right to an attorney at each stage of the proceeding.
>
> (b) The right to a court-appointed attorney if the respondent is financially unable to employ an attorney.
>
> (c) If the respondent is not represented by an attorney, the right to request and receive a court-appointed attorney at a later proceeding. [Emphasis added.]

The Legislature also specifically addressed a respondent's indigence in a separate subsection of the same statute: "If it appears to the court in a proceeding under section 2(b) or (c) of this chapter that the respondent wants an attorney and is financially unable to retain an

attorney, the court *shall* appoint an attorney to represent the respondent." MCL 712A.17c(5) (emphasis added).

In MCR 3.915(B)(1), our Supreme Court delineated the procedures that must be employed in child protective proceedings to implement the statutory right to appointed counsel. The court rule provides:

> (a) At respondent's first court appearance, the court shall advise the respondent of the right to retain an attorney to represent the respondent at any hearing conducted pursuant to these rules and that
>
> (i) the respondent has the right to a court appointed attorney if the respondent is financially unable to retain and attorney, and,
>
> (ii) if the respondent is not represented by an attorney, the respondent may request a court-appointed attorney at any later hearing.
>
> (b) The court shall appoint an attorney to represent the respondent at any hearing conducted pursuant to these rules if
>
> (i) the respondent requests appointment of an attorney, and
>
> (ii) it appears to the court, following an examination of the record, through written financial statements, or otherwise, that the respondent is financially unable to retain an attorney.

This Court has explicitly recognized that the United States Constitution guarantees a right to counsel in parental rights termination cases. In *In re Powers*, 244 Mich App at 121, this Court explained: "The constitutional concepts of due process and equal protection also grant respondents in termination proceedings the right to counsel." This Court has also explicitly recognized that the constitutional right of due process confers on indigent parents the right to appointed counsel at

hearings that may involve the termination of their parental rights. *In re Cobb*, 130 Mich App 598, 600; 344 NW2d 12 (1983).

We now consider when these legislative and judicial mandates designed to safeguard an indigent respondent's right to appointed counsel attached to respondent father. Both MCL 712A.17c(4) and MCR 3.915(B)(1)(b) specifically extend the right of appointed counsel only to indigent "respondent[s]" in child protective proceedings. The initial petition contained no allegations of wrongdoing against respondent father, and expressed no concerns about his ability to parent Makyla. Consequently, at the preliminary hearing, the adjudication, and the dispositional hearing, respondent father did not qualify as a "respondent."[6] Although the foster care workers voiced some concerns involving respondent father's medical condition, at no point until petitioner filed the supplemental petition did it directly identify an act or omission that converted respondent father's status from that of a nonoffending parent into that of a respondent. Under the applicable statute and court rule, respondent father thus enjoyed no right to appointed counsel during the first four months of the proceedings. However, when the circuit court authorized the supplemental petition on October 6, 2008, it was required to advise respondent father of his right to appointed counsel.

At the termination hearing, respondent father unequivocally requested the appointment of counsel. The

---

[6] The court rules define the term "respondent" as "the parent, guardian, legal custodian, or nonparent adult who is alleged to have committed an offense against a child." MCR 3.903(C)(10). The term "offense against a child" is defined as "an act or omission by a parent, guardian, nonparent adult, or legal custodian asserted as grounds for bringing the child within the jurisdiction of the court pursuant to the Juvenile Code." MCR 3.903(C)(7).

record reflects that the referee utilized a screening process to determine that respondent father did not qualify for appointed counsel. The screening procedure imputed to respondent father all the income of his household, including that earned by his parents. We reject the idea that a court may deny a respondent appointed counsel by imputing to the respondent income earned by people who bear no legal responsibility to contribute to the respondent's legal expenses. Mere cohabitants, even if parents of an adult respondent, possess no obligation to pay the respondent's attorney fees, and a court may not prohibit a respondent from exercising the right to appointed counsel on the basis of a calculation that imputes income from sources unavailable to the respondent. Because respondent father's parents had no legal obligation to pay for an attorney for their adult son, their assets simply had no relevance to a determination of respondent father's indigence.[7] Furthermore, petitioner contended at the termination hearing that respondent father's lack of "independent housing" and his insufficient income supplied grounds for terminating his rights. We find it fundamentally unfair to deny appointed counsel because a respondent does not qualify as indigent, while at the same time invoking the respondent's indigence as a ground for terminating parental rights. And we note that the circuit court apparently had no difficulty in appointing counsel for respondent father's appeal. Under the circumstances presented here, the referee erred by rejecting respondent father's request for appointed counsel at the termination hearing because the court improperly imputed to respondent income earned by others.

[7] MCR 6.005(B) sets forth the factors that must guide a court's determination of a criminal defendant's indigency. Those factors do not mention income earned by others.

An erroneous deprivation of appointed counsel for child protective proceedings can be subject to a harmless error analysis. *In re Hall*, 188 Mich App 217, 222-223; 469 NW2d 56 (1991). But we do not view as harmless in this case the referee's failure to inform respondent father at the permanency planning hearing about his right to counsel, or the referee's refusal to appoint counsel at the termination hearing.[8] Because these plain errors affected the fundamental fairness of the proceedings, we conclude that the absence of counsel does not qualify as harmless. *Carines*, 460 Mich at 763-764, 774 (here the erroneous deprivation of counsel seriously affected the fairness and integrity of the judicial proceedings).

### III. SUMMARY

The circuit court correctly terminated respondent mother's parental rights for the reasons described in this opinion. However, at the permanency planning hearing, the referee plainly erred by failing to advise respondent father of his right to appointed counsel, and compounded this error by refusing to appoint counsel at the termination hearing. These plain errors affected respondent father's substantial rights. The continuous and ongoing nature of the referee's errors concerning respondent father's right to appointed counsel affected "the fairness, integrity, or public reputation" of these proceedings. *Id.* at 774. Accordingly, we reverse the part of the order terminating respondent father's parental rights and remand for further proceedings consistent with this opinion.

[8] The referee conducted these two hearings after petitioner filed the permanent custody petition identifying respondent father as a respondent, thus triggering his right to appointed counsel under MCR 3.915(B)(1).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

OWENS, P.J., and SERVITTO and GLEICHER, JJ., concurred.

GLEICHER, J. (*concurring*). I concur with the result reached by the majority. I write separately to express my view that respondent father's right to appointed counsel attached at the outset of the proceedings, rather than when petitioner filed the supplemental permanent custody petition identifying him as a respondent. I believe that when the circuit court deprived respondent father of the custody of his child, fundamental due process principles required that the circuit court offer respondent father appointed counsel in accordance with MCR 3.915(B)(1). I also write separately to elaborate on the reasons why I view the deprivation of counsel as highly prejudicial error in this case.

At the adjudication trial, petitioner recommended against respondent father's having custody of Makyla and the referee unquestioningly accepted this recommendation. Despite respondent father's persistent requests for custody and his undisputed fitness, the referee inexplicably ordered Maklya's placement with petitioner. Petitioner's expressed opposition to respondent father's custody of his child and the referee's determination at the adjudication that "transferring this child back to the home of either parent would be inappropriate and would potentially cause more harm that any good that can come of it," functionally altered respondent father's status from that of a nonoffending parent to that of a respondent. When petitioner and the referee articulated that Makyla would be at risk in respondent father's custody, he qualified as a de facto respondent notwithstanding the absence of any formal allegations against him.

The importance of a parent's "essential" and "precious" right to raise his or her child is well-established in our jurisprudence. *Hunter v Hunter*, 484 Mich 247, 257; 771 NW2d 694 (2009). Because "[t]his right is not easily relinquished," "to satisfy constitutional due process standards, the state must provide the parents with fundamentally fair procedures." *Id.* at 257 (quotation marks and citation omitted). As our Supreme Court acknowledged in *Hunter*, "where the parental interest is most in jeopardy, due process concerns are most heightened." *Id.* at 269.

Fundamental due process principles required that petitioner and the referee consider respondent father a respondent, and inform him at the adjudication trial of his right to appointed counsel. This is so because petitioner sought to deprive respondent father of his fundamental right to custody of Makyla for an unspecified period, and the referee agreed to this proposal. "There is no question that parents have a due process liberty interest in caring for their children . . . ." *In re AMB*, 248 Mich App 144, 209; 640 NW2d 262 (2001). Child protective proceedings that divest a nonoffending parent of his or her child's custody implicate that liberty interest, regardless of whether the petitioner has *formally* identified the parent as a respondent.

In my view, the process due when a court deprives a nonoffending parent of his or her child's custody should be determined by balancing the three factors described in *Mathews v Eldridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and admin-

istrative burdens that the additional or substitute procedural requirement would entail.

These factors recognize that due process " 'is flexible and calls for such procedural protections as the particular situation demands.' " *Id.* at 334, quoting *Morrissey v Brewer*, 408 US 471, 481; 92 S Ct 2593; 33 L Ed 2d 484 (1972).

Here, application of the *Eldridge* factors compels the conclusion that the referee should have offered respondent father appointed counsel at the adjudication trial and at every hearing conducted thereafter. First, the private interest of a parent in the care, custody, and control of his or her children is one of the oldest fundamental liberty interests recognized by the United States Supreme Court. *Troxel v Granville*, 530 US 57, 65; 120 S Ct 2054; 147 L Ed 2d 49 (2000). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v Massachusetts*, 321 US 158, 166; 64 S Ct 438; 88 L Ed 645 (1944). Because respondent father possessed a substantial and constitutionally protected interest in maintaining custody of Makyla, the first *Eldridge* factor weighs heavily in favor of his right to appointed counsel.

The second *Eldridge* factor considers the risks of error inherent in a proceeding. Here, the risk of erroneously depriving respondent father of his custodial right qualified as substantial. Without assistance from counsel, respondent father lacked the ability to fully comprehend that although he had not been formally named as a respondent, his fundamental right to custody hung in the balance during each and every hearing conducted in this case. Thus, a substantial risk existed that respondent father would suffer an erroneous dep-

rivation of his custody of Makyla, despite that no evidence proved his unfitness. Appointed counsel would have identified the complete absence of allegations of respondent father's unfitness, and would have reminded the court that because Makyla spent her days in respondent father's home, the evidence strongly supported that she would remain safe in his custody.

Counsel additionally could have argued that if petitioner intended to use respondent father's sarcoidosis as a ground for terminating his rights, it first had to fully investigate the actual extent of his disability, and then offer services addressing any pertinent physical limitations.[1] Counsel would have emphasized that the foster care workers who testified in support of depriving respondent father of custody premised their opinions solely on a one-page form containing minimal diagnostic information, and that the workers had not actually spoken to the physician or determined that he possessed an understanding of the issues presented in a child welfare case. Counsel would have pursued additional medical information, pointed out that respondent father resided in a stable home with parents who assisted him when necessary, and would have vigorously challenged petitioner's claim that the sarcoidosis disqualified respondent father from raising his child. Lacking counsel's assistance, respondent father had no opportunity to advocate that under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, his sarcoidosis served to *enhance* petitioner's obligation to initiate meaningful reunification efforts.

---

[1] Undoubtedly, counsel additionally would have highlighted that the burden of proof obligates *petitioner* to establish respondent father's unfitness, physical or otherwise, by clear and convincing evidence. MCR 3.977(A)(3); MCL 712A.19b(3). The caseworker's testimony in this case suggests that petitioner improperly shifted to respondent father the burden of substantiating his physical fitness.

The third *Eldridge* factor involves the state's interests. Admittedly, appointment of counsel would impose on the state a financial burden. But this burden became inevitable once petitioner formally announced its intent to terminate respondent father's parental rights. Affording counsel during the months that petitioner deliberately sought to deprive respondent father of Makyla's custody likely would have spared the expense of repeating these proceedings, and would have contributed to a more reliable outcome. After balancing the *Eldridge* factors, I conclude that due process required that the circuit court afford respondent father the right to appointed counsel when it first ordered that Makyla reside outside his custody.

In *Lassiter v Dep't of Social Services of Durham Co, North Carolina*, 452 US 18, 31; 101 S Ct 2153; 68 L Ed 2d 640 (1981), the United States Supreme Court described the following hypothetical situation in which appointment of counsel would be required in a child protective proceeding:

> If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel.

In my view, this is such a case. Irrespective that the applicable state statute and court rule did not mandate the appointment of counsel for respondent father before petitioner formally identified him as a respondent, I believe that basic notions of procedural due process triggered that right when the court denied his requests for custody of his child.

Furthermore, I believe that additional and compelling reasons support a determination that the deprivation of respondent father's right to counsel at the permanency planning and termination hearings cannot qualify as harmless error. The initial petition filed in this case did not mention respondent father's pulmonary disease or any concern about his physical ability to parent Makyla. At the dispositional hearing, foster care worker Amanda Forrester admitted that she needed additional information from respondent father's physician concerning the physician's conclusion that respondent father's condition would prevent him from raising a child. When asked, "[Y]ou don't see any reason why he can't provide care with . . . the assistance of his family members as it's going on," Forrester replied, "No." At the dispositional review hearing, the referee took note that respondent father received ongoing treatment for sarcoidosis, and identified reunification as the permanency plan. Not until petitioner filed the supplemental petition did it first assert that respondent father's medical condition prohibited him from caring for his child. And at the termination hearing, the evidence marshaled in support of terminating respondent father's rights concentrated almost exclusively on his alleged physical limitations.

Had the referee appointed counsel for respondent father, counsel certainly would have raised several legal arguments on respondent father's behalf that likely would have significantly affected the proceedings. First, counsel would have recognized from the outset of the proceedings that respondent father's pulmonary sarcoidosis potentially qualified him for services under the ADA. The ADA requires the petitioner "to make reasonable accommodations for those individuals with disabilities so that all persons may receive the benefits of public programs and services." *In re Terry*, 240 Mich

App 14, 25; 610 NW2d 563 (2000). "[I]f the FIA [Family Independence Agency] fails to take into account the parents' limitations or disabilities and make any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family." *Id.* at 26. Petitioner undisputedly failed to make any reasonable accommodations for respondent father, notwithstanding that it utilized his sarcoidosis as the primary basis for terminating his parental rights. Counsel also would have recognized that because the circuit court had not conducted an adjudication of the allegations against respondent-father, petitioner was limited to presenting legally admissible evidence in support of terminating his parental rights. *In re CR*, 250 Mich App 185, 205-206; 646 NW2d 506 (2002).

Finally, little evidence in the record supported a conclusion that respondent father lacked the capacity to parent Makyla because of his physical limitations. The form filled out by respondent father's physician described only that he needed assistance with meal preparation, shopping, laundry, and housework. These limitations, standing alone and in the absence of any evidence of unfitness, do not amount to clear and convincing grounds on which to terminate a parent's fundamental constitutional right to custody of a child. Furthermore, the physician's hearsay opinion that respondent father's medical condition would "keep him from being able to parent/raise a 4-month old child until he is an adult," without more, does not constitute legally admissible, clear and convincing evidence of unfitness. Had counsel appeared on respondent father's behalf, the inherent weaknesses of the one-page medical form, and its lack of clear evidentiary support for termination, would have been stressed. Counsel also could have presented evidence on behalf of respondent father, emphasized his ongoing commitment to caring

for and financially supporting his daughter, and argued that no evidence supported that he ever had failed to provide proper care or custody for the child. Given the weak evidence supporting termination and the strength of contrary arguments that an attorney could have presented, the outcome of the proceedings likely would have differed in the presence of counsel.