*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M. MILLER, Minor.

UNPUBLISHED
April 16, 2025
3:20 PM

No. 372181
Jackson Circuit Court
Family Division
LC No. 23-000450-NA

Before: BORRELLO, P.J., and RIORDAN and PATEL, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her minor child, MM, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist) and MCL 712A.19b(3)(g) (failure to provide proper care and custody). We affirm.

## I. FACTS

In about 2009, respondent-mother's parental rights to a previous child were terminated because of her cognitive inability to care for the child and the presence of domestic violence in her relationship at the time. In 2023, the Department of Health and Human Services (DHHS) removed MM from the care of respondent-mother after an ex parte order was granted based on the allegations that her cognitive disability prevented her from properly caring for MM and that she was in an unsafe relationship with her current boyfriend. Respondent-mother pleaded no contest to the allegations in the petition for removal. In mid-2024, the DHHS petitioned to terminate respondent-mother's parental rights under several statutory grounds, including MCL 712A.19b(3)(c)(*i*) and (g).

At trial, in the instant matter, the court heard testimony regarding termination of respondent-mother's parental rights. The trial court found that the issues from her prior termination still existed and that respondent-mother was unable to provide proper care and custody for MM within a reasonable time. At the conclusion of trial, the trial court terminated respondent-mother's parental rights.

-1-

Respondent-mother now appeals as of right, arguing that the statutory grounds were not proven, that the DHHS did not make reasonable efforts to reunify, and that termination was not in MM's best interests. We disagree.

## II. STATUTORY GROUNDS

"A court may terminate a respondent's parental rights if one or more of the statutory grounds for termination . . . have been proven by clear and convincing evidence." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "We review for clear error . . . the court's decision that a ground for termination has been proven by clear and convincing evidence . . . ." *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted).

The trial court terminated respondent-mother's rights to MM pursuant to MCL 712A.19b(3)(c)(*i*) and (g). However, respondent-mother does not challenge the trial court's findings with regard to the statutory grounds supporting termination under MCL 712A.19b(3)(g). Therefore, we may assume that the trial court did not clearly err by making those findings. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1999), overruled in part on other grounds by *Trejo*, 462 Mich at 353. Termination need only be supported by one statutory ground. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009). Nevertheless, we will address the statutory ground that she does challenge on appeal.

MCL 712A.19b(3)(c)(*i*) provides:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Termination is proper on this ground when "the totality of the evidence" supports that the respondent-parent did not accomplish "any meaningful change in the conditions" that led to adjudication, and that an additional "lengthy period" of services would be required before reunification is warranted. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009).

The record supports the trial court's findings that the conditions that led to respondent-mother's adjudication continued to exist. The conditions pertaining to respondent-mother at the time of adjudication include her inability to recognize and care for MM's needs and her participation in an unsafe relationship despite a history of domestic violence. The record supports

that, at the time of termination, the conditions that led to adjudication of MM still existed. For example, respondent-mother felt that MM "would be fine if he were home with her" and that he would not "need these services if he were home with her," despite extensive testimony from the service providers otherwise.[1] Moreover, the trial court noted that respondent-mother essentially "left the door open" to her boyfriend because a provider saw an image of him appear on respondent-mother's phone during a session and that "she would have cut him off" had she "benefitted from . . . domestic violence counseling that domestic violence is harmful, not just to the victim, but it's harmful to the child." Therefore, "the totality of the evidence" amply supported that respondent-mother "had not accomplished any meaningful change" in the conditions that led to the court assuming jurisdiction over MM. *Id*.

Additionally, MCL 712A.19b(3)(c)(*i*) requires the trial court to find that respondent-mother would be unable to rectify the conditions within a reasonable time. Here, respondent-mother eventually participated in services but not until February 2024, approximately nine months after the trial court issued the initial order of disposition. MM's case manager testified that there were no "services that would be relevant in a reasonable amount of time" considering that MM had been in placement since his birth and that services had lasted "well over a year" by the date of trial. Moreover, the record supports that respondent-mother's boyfriend attempted to contact her during one of MM's sessions despite repeated recommendations from her providers to eliminate contact with him, indicating that, even if she was afforded more time with services, she likely was not going to benefit from it. In other words, because respondent-mother seemingly failed to eliminate contact with her boyfriend despite several months of services, additional services were unlikely to be helpful or appropriate. Therefore, the trial court did not clearly err by finding that respondent-mother would be unable to rectify the conditions that led to adjudication with respect to MM within a reasonable time. See MCL 712A.19b(3)(c)(*i*); *Williams*, 286 Mich App at 272.

Accordingly, the trial court did not clearly err by finding that the ground for termination set forth in MCL 712A.19b(3)(c)(*i*) was proven by clear and convincing evidence.

## III. REASONABLE EFFORTS

Generally, the issue whether petitioner made reasonable efforts to preserve and reunify the family is reviewed for clear error. See *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). Moreover, "[w]hether proceedings complied with a party's right to due process presents a question of constitutional law that we review de novo." *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.). However, this issue is not preserved. Unpreserved issues are reviewed for plain error affecting substantial rights. *In re MJC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 365616); slip op at 2; *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020). "To avoid forfeiture under the plain-error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, [and] 3) the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412

---

[1] For instance, MM's case manager testified that MM had "extensive needs" cared for by several providers and that MM was at risk of harm in his mother's care because there was concern that "she would not know what to do" if MM became sick or injured requiring hospitalization and that she would not "continue services to help bolster . . . his development."

(2011) (quotation marks and citations omitted). An error affects substantial rights "if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008).

Generally, the DHHS has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights. *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). And, as part of those reasonable efforts, the DHHS "must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86. The Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., obligates the DHHS to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless the modifications would fundamentally alter the services provided. *In re Sanborn*, 337 Mich App 252, 263; 976 NW2d 44 (2021) (quotation marks and citation omitted). "This includes a parent with a known or suspected intellectual, cognitive, or developmental impairment." *Id*. (cleaned up).

To offer accommodations required by the ADA, the DHHS "must have knowledge that the individual is disabled, either because that disability is obvious or because that individual (or someone else) has informed the entity of the disability." *Hicks/Brown*, 500 Mich at 87 (quotation marks and citation omitted). When the DHHS knows of a disability, it bears the duty to reasonably accommodate the disability by furnishing services that are designed to facilitate the child's return home. *In re Hicks*, 315 Mich App 251, 281-282; 890 NW2d 696 (2016), vacated in part on other grounds *Hicks/Brown*, 500 Mich 79. The DHHS must:

> offer evaluations to determine the nature and extent of the parent's disability and to secure recommendations for tailoring necessary reunification services to the individual. The DHHS must then endeavor to locate agencies that can provide services geared toward assisting the parent to overcome obstacles to reunification. If no local agency catering to the needs of such individuals exists, the DHHS must ensure that the available service providers modify or adjust their programs to allow the parent an opportunity to benefit equally to a nondisabled parent. [*Id*. at 282.]

"Absent reasonable modifications, efforts at reunification cannot be reasonable [when the DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Sanborn*, 337 Mich App at 264 (quotation marks and citation omitted).

In the present case, the DHHS offered many services to respondent-mother throughout the proceedings. Respondent-mother initially completed a psychological evaluation. The recommendations following the psychological evaluation included that respondent-mother complete an IQ test, participate in therapy and a domestic-violence support group, and obtain a letter from her neurologist supporting custody of MM from a medical standpoint. After respondent-mother completed her IQ test, the post-IQ test recommendations included the following: she could not be in a relationship with her boyfriend, she should attend an additional domestic-violence support class regarding "the cycle of control in relationship," she must "engage in therapy" and that the therapy should offer virtual sessions because she could not drive, her "anemic support system . . . must be bolstered," the DHHS should provide "additional in-home

programs to ensure she is understanding how to properly care for" MM, and her neurologist must endorse her ability to safely care for MM. The trial court incorporated all those recommendations into respondent-mother's treatment plan and, at trial, the court held that she "clearly ha[d] not benefitted from the services that [were] offered."

Although "the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). A respondent must demonstrate that he or she "sufficiently benefited from the services provided." *Id*. In the matter before us, the record establishes that the DHHS made reasonable efforts to accommodate respondent-mother's cognitive disability based on the recommendations of her psychological evaluation and IQ test. The record further reveals that respondent-mother failed to adequately participate in, or benefit from, certain services provided to her. Moreover, when challenging the services offered, a respondent must establish that he or she "would have fared better if other services had been offered." *Sanborn*, 337 Mich App at 264. The only service that respondent-mother contends was insufficient was the explanation of why the domestic-violence support group was necessary in addition to her therapy sessions, as well as the lack of help registering for the group. However, given respondent-mother's history of being victimized by domestic violence, the need for the support group is, or should have been, self-evident. Further, the DHHS referred respondent-mother to support groups that were within walking distance of her residence and available virtually. However, respondent-mother "did not seem to understand why she needed it" and later told the DHHS that "there was no availability." The record, therefore, indicates that the DHHS made reasonable accommodations for respondent-mother by finding a group within walking distance that also offered virtual sessions.

In sum, respondent-mother failed to benefit from the services offered by the DHHS, and those specific services were tailored to her specific disability. See *Frey*, 297 Mich App at 248. There is no indication that respondent would have fared better if the DHHS had offered other services, additional services, or additional accommodations. See *Sanborn*, 337 Mich App at 264. Therefore, the trial court did not plainly err when it determined that the DHHS made reasonable efforts to promote reunification consistent with the ADA.

## IV. BEST INTERESTS

"[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *Moss*, 301 Mich App at 90. The trial court's finding is reviewed for clear error. See *id*. at 80.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *Olive/Metts*, 297 Mich App at 40. "[T]he focus at the best-interest stage" is on the child, not the parent. *Moss*, 301 Mich App at 87. The trial court should weigh all the evidence available to it in determining the child's best interests, and may consider such factors as "the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). Other considerations include the length of time the child was in foster care or placed with relatives; the likelihood that "the child could be returned to her parent's home within

the foreseeable future, if at all"; and compliance with the case service plan. *Frey*, 297 Mich App at 248-249.

In the present case, the trial court found that it was in MM's best interests to terminate respondent-mother's parental rights because he "deserve[d] permanency," and the court had "zero confidence that, in any period of time, and certainly not a reasonable period of time[,] that mom would be able to supply that." Moreover, MM's foster parents recognized his needs, provided him permanency, and he was "well bonded" to them.

Respondent-mother did not provide evidence of improvements to her ability to appropriately care for MM nor her ability to maintain safe relationships. Regarding caring for MM, respondent-mother did not react to MM eating too large of a bite of food, and a provider intervened by swiping the food from his mouth to prevent him from choking. Respondent-mother "shrugged it off" and stated that "he would be fine" and that "he would figure it out." Moreover, MM was "so behind on his language," but respondent-mother was "minimally engaged" with the explanations from MM's speech worker on how to aid in his language development outside of sessions. On several occasions, respondent-mother told a parenting-class worker that MM "would be fine if he were at home with her" and "that he didn't necessarily need all these services" despite his "significant delay" and "continued failure to thrive." MM's case manager testified that respondent-mother did not "seem to understand the significance of" MM's "comprehensive speech and feeding therapy appointments," and she often "looked to [the] placement [parent] to be able to answer" questions about MM's development. In one incident before trial, MM needed tubes placed in his ears because of recurring ear infections, and respondent-mother wanted to obtain a second opinion from another doctor but refused to share the doctor's information with the DHHS. Respondent-mother did not approve the surgery, and the DHHS requested and received approval from the trial court. Otherwise, the surgery would have been delayed for months, causing more ear infections.

Regarding domestic violence counseling, respondent-mother did not attend a domestic-violence support group as recommended. A provider reported that she saw an image of respondent-mother's boyfriend appear on respondent-mother's phone when he attempted to call her during a session for MM despite the recommendation of her psychological evaluator and IQ-test provider that she not have contact with him.

Additionally, MM's placement with her foster family was reported to be appropriate and a preadoptive placement because MM "appear[ed] to have a bond with them" and that he "appear[ed] to have a bond" with respondent-mother but "not necessarily a secure bond." MM recognized his mother and "seem[ed] to be familiar with her," but he was not as "animated" with her as he was with his foster parents or service providers. The foster family indicated that they would adopt MM if necessary. The family had "a good understanding" of MM's "special needs." They brought MM to "all of his appointments" and "[made] sure he [was] getting all of his needs met." Additionally, they were "very, very supportive of what services [were] required and what . . . he need[ed] in order to thrive." Given MM's need for permanence and stability, the minimal changes to respondent-mother's unsafe relationship and parenting ability since the earlier termination, and the willingness and demonstrated capability of the foster family to care for MM, the trial court did not clearly err by finding that termination served MM's best interests. See *Moss*, 301 Mich App at 90.

## V. CONCLUSION

The trial court did not err by terminating respondent-mother's parental rights to MM.  We affirm.

/s/ Stephen L. Borrello
/s/ Michael J. Riordan
/s/ Sima G. Patel