*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CITY OF MADISON HEIGHTS,

        Plaintiff-Appellee,

v

GARY A. SAYERS, ELECTRO-PLATING
SERVICES, INC., SAYERS VENTURES LIMITED
PARTNERSHIP, SAYERS ENTERPRISES, LLC,
SAYERS ENTERPRISES III, LLC, and JOHN
DOE,

        Defendants-Appellants.

UNPUBLISHED
November 9, 2021

No. 354330
Oakland Circuit Court
LC No. 2018-169728-CZ

Before: GLEICHER, P.J., and K. F. KELLY and RONAYNE KRAUSE, JJ.

PER CURIAM.

The city of Madison Heights sued Gary A. Sayers and his various companies to abate the nuisance caused by his dilapidated industrial buildings, housing thousands of corroding barrels of toxic, flammable, and explosive chemicals. One building contained a large earthen pit filled with green ooze—the highly toxic and carcinogenic hexavalent chromium—that eventually leaked through the ground onto nearby I-696. The parties accepted a case evaluation award for the city on its damages claims, and the city's nuisance-abatement claim was decided in its favor after trial.

Sayers contends that the court could not exempt the equitable nuisance-abatement claim from the case-evaluation process. However, the court issued its ruling before either side accepted or rejected the evaluation, leaving this decision within the court's discretion. Sayers also challenges the trial court's factual findings after the bench trial on the nuisance-abatement claim, and the court's order to remedy the public nuisance through demolition of the subject buildings. We discern no error in these regards. We affirm.

## I. BACKGROUND

This case involves three buildings located at 901, 925, 945, and 959 E. Ten Mile Road in Madison Heights, all owned by Gary Sayers and his companies. A fourth building, located at 937 E. Ten Mile Road, had already been condemned and demolished by the time this action was filed.

The buildings were used as a factory where metal was "plated" for industrial uses. In May 2016, the city fire marshal investigated the properties and observed a large amount of debris that he described as "hoarding." Inside Building 945/959 were thousands of containers holding hazardous waste. Some of the containers were open, some were leaking, some were severely corroded, and some were unlabeled. Further, some were placed next to combustible materials such as gasoline and acetylene tanks. The fire marshal further noted copious amounts of debris, blocking exits and making it difficult to walk through the buildings. The roofs and floors were caving in, support beams were heavily corroded and deteriorating, and stairwells had come loose. In the basement of Building 945/959, the fire marshal found an earthen pit dug into the ground. The pit was not lined with cement or any other protective coating, was filled with green ooze, and was located directly beneath the vats and containers on the plating level. The fire marshal surmised that any overflow from the plating lines travelled into the pit, which acted as a catch basin.

The fire marshal issued Sayers an extensive list of fire-code violations. He contacted the Michigan Department of Environmental Quality (MDEQ), which has since been renamed the Michigan Department of Environment, Great Lakes, and Energy (EGLE), and the Madison Heights Building Department. The MDEQ had already issued Sayers numerous warnings between 2004 and 2008, and Sayers had signed a consent order to remedy many hazardous conditions, none of which he had accomplished. In June 2016, the MDEQ issued a new notice with a laundry list of violations. Sayers did not respond, and during a follow-up inspection in November 2016, Sayers admitted that he had done nothing to remedy the described dangerous conditions. The MDEQ issued a new violation warning in December 2016. Sayers responded, but did not address all the cited violations and provided no documentation to support that any condition had been remedied. Believing the situation posed an imminent and substantial risk to public health, the MDEQ contacted the Department of Health and Human Services (DHHS). The DHHS agreed, and on December 21, 2016, the MDEQ issued a cease and desist order for the plating operation at the property.

State officials asked the federal Environmental Protection Agency (EPA) to intervene. Jeffrey Lippert, the EPA's on-scene coordinator, first assessed Building 945/959 on December 30, 2016. Lippert had never observed a site in such deplorable condition: clutter, drums, and containers were everywhere; acid had eaten through an I-beam in the basement; vats were filthy, overflowing, leaking, and severely corroded; there was a pit filled with green liquid, drums cut in half with unknown material inside, holes in the floor, staircases "propped up" against other floors, and entirely missing floor sections. Rudimentary plank bridges spanned gaps in the floor. Lippert determined that a time-critical removal was needed, and his supervisors agreed.

Removal activities spanned April through December 2017. Every container was inventoried and sampled. The waste removed included 369,000 pounds of cyanide, 34,800 pounds of solid waste, and 320,700 pounds of liquid waste. The green liquid in the earthen pit was identified and quantified as 14,315 gallons of hexavalent chromium. A hidden second pit was also discovered. This concrete pit contained liquid cyanide and sludge. After the materials were removed from both pits, the earthen pit was filled with crushed concrete. Samples taken along the northern edge of Building 945/959 revealed that the soil was a purplish, brownish color and was contaminated with hexavalent chromium.

On December 20, 2019, a major news story broke—bright green ooze was found on the shoulder of I-696, directly behind the north edge of Building 945/959. The ooze contained hexavalent chromium, trichloroethylene, cyanide, and other metals. All of these substances are dangerous to humans. The EGLE immediately responded. A primary concern was that this fluid would flow into the storm drains along the expressway. These drains do not go through sewage treatment plants, but instead move water and debris directly into streams and lakes. To help abate the discharge from Building 945/959 onto the freeway, the ELGE installed sump pumps in the earthen pit and on the freeway embankment. Groundwater tests still produced concerning results, so a 40-to-60-foot-long "interceptor trench" was installed along the I-696 service drive, along with a 20-by-20-foot "interceptor pit." Soil sampling around the perimeter of Building 945/959 also preliminarily indicated that the soil was contaminated.[1]

Tracy Kecskemeti, an EGLE district supervisor, testified that to properly address the contamination, its actual source to be removed—the soil under Building 945/959. The only way to accomplish that goal was to first remove the building. Otherwise, the pumping of groundwater would have to continue "forever." Another EGLE manager, Alexandra Clark, reiterated that the pumps, interceptor trench, and pit were not long-term solutions. Rather, the land had to be remediated, which necessitated the removal of Building 945/959.

Concerned about the danger to its citizens and their property, the city of Madison Heights filed the instant action, alleging two counts in its amended complaint: (1) nuisance requiring abatement, and (2) damage to the land and the city's sanitary sewer main. Sayers filed a counterclaim, raising three counts: (1) taking of property without just compensation, (2) deprivation of constitutional rights, and (3) declaratory relief.

The matter proceeded to case evaluation and a panel evaluated the city's claims at $225,000. Before either party filed an acceptance or rejection, the city filed a motion with the trial court seeking clarification that the case-evaluation award pertained only to its claim for damages and did not affect the equitable action of nuisance-abatement. Over Sayers's objections, the court ruled that the case evaluation did not dispose of the city's equitable claims. Thus, mutual acceptance of the award would not dispose of the equitable claim. The parties subsequently each accepted the award, and the court entered a damages judgment of $225,000 in the city's favor. The judgment specifically indicated that it was not a final judgment as the nuisance-abatement claim remained pending. Sayers renewed his objection on behalf of himself and his corporations, asserting that the mutual acceptance of the case-evaluation award resolved the nuisance-abatement claim as well as the damages claim, and thereby ended the case. The court rejected this argument and the judgment remained in place.

The remaining nuisance-abatement claim proceeded to a lengthy bench trial. At the conclusion of the trial, the court determined that Building 945/959 and two portions of Building

---

[1] The EPA drilled 25 soil borings around all four sides of Building 945/959 and installed groundwater monitoring wells. The results had not been "fully interpreted" at the time of trial, "but they certainly show[ed] contaminants on all sides of the building." The EPA planned to repeat the testing with the testing ring set farther away from the building. This process would continue until no more contamination was detected.

901 were public nuisances that had to be demolished. The court further enjoined the use or occupation of the remaining portion of Building 901 and Building 925 until they were brought up to applicable local codes. However, the court included two "caveats" in its judgment: (1) if future analysis revealed that the ground around and under Buildings 925 and the remaining portion of Building 901 were contaminated and that remediation could not be accomplished without demolition, then those buildings would be deemed public nuisances and removed; and (2) if the two condemned portions of Building 901 could not be demolished in a manner that would allow the third portion of the building to survive on its own, then the entirety of Building 901 would be demolished.

## II. EFFECT OF CASE EVALUATION ACCEPTANCE

Sayers and his corporations continue to complain that the parties' mutual acceptance of the case-evaluation award resolved not only the issue of damages, but also the issue of nuisance abatement. The resolution of this issue depends on the proper interpretation of the court rule governing case evaluation—MCR 2.403. The proper construction and application of court rules is a question of law that we review de novo. *Magdich & Assocs, PC v Novi Dev Assocs LLC*, 305 Mich App 272, 275; 851 NW2d 585 (2014). We employ statutory construction principles to interpret court rules. *Id.* We must apply the rule's plain and unambiguous language as written. *CAM Constr v Lake Edgewood Condo Ass'n*, 465 Mich 549, 554; 640 NW2d 256 (2002), quoting *Grievance Administrator v Underwood*, 462 Mich 188, 193-194; 612 NW2d 116 (2000).

MCR 2.403 governs case evaluation, and provides, in relevant part:

**(A) Scope and Applicability of Rule.**

(1) A court may submit to case evaluation any civil action in which the relief sought is primarily money damages or division of property.

\* \* \*

(3) A court may exempt claims seeking equitable relief from case evaluation for good cause shown on motion or by stipulation of the parties if the court finds that case evaluation of such claims would be inappropriate.

\* \* \*

**(K) Decision.**

\* \* \*

(3) The evaluation may not include a separate award on any claim for equitable relief, but the panel may consider such claims in determining the amount of an award.

\* \* \*

**(M) Effect of Acceptance of Evaluation.**

-4-

(1) If all the parties accept the panel's evaluation, judgment will be entered in accordance with the evaluation, unless the amount of the award is paid within 28 days after notification of the acceptances, in which case the court shall dismiss the action with prejudice. The judgment or dismissal shall be deemed to dispose of all claims in the action and includes all fees, costs, and interest to the date it is entered . . . .

The general "purpose of MCR 2.403 is to expedite and simplify the final settlement of cases to avoid a trial," and acceptance of case evaluation "serves as a final adjudication . . . and is therefore binding on the parties similar to a consent judgment or settlement agreement." *Magdich*, 305 Mich App at 276 (ellipsis in original), quoting *Larson v Auto-Owners Ins Co*, 194 Mich App 329, 332; 486 NW2d 128 (1992). It is important to note that nuisance-abatement claims are equitable in nature. *Ypsilanti Twp v Kircher*, 281 Mich App 251, 270; 761 NW2d 761 (2008). The city delayed in filing its motion to exempt the nuisance-abatement claim from the case-evaluation process until the evaluation had already been made. However, neither party had yet accepted or rejected the evaluation and therefore the court still had discretion to consider this motion. Compare *CAM Constr*, 465 Mich at 551-552 (in which a party waited until after both parties had accepted the case-evaluation award to argue that certain claims were excluded from the process). And as permitted by MCR 2.403(A)(3), on good cause shown, the court exempted from the case-evaluation process the equitable nuisance-abatement claim. When the parties subsequently accepted the case-evaluation award, the acceptance applied only to the damages claim. The judgment of dismissal also only applied to the damages claim, the only claim then before the case-evaluation panel. See MCR 2.403(M)(1). Sayers does not contend that the court lacked good cause to exempt the nuisance-abatement claim and is not entitled to relief.[2]

## III. PUBLIC NUISANCE RULING

Sayers next challenges the trial court's conclusion that the conditions on his properties constituted public nuisances. As nuisance-abatement proceedings are equitable in nature, we review the court's ultimate decision de novo, but review its factual findings for clear error. *Capitol Props Group, LLC v 1247 Ctr Street, LLC*, 283 Mich App 422, 430; 770 NW2d 105 (2009).

A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. We overstep our review function if we substitute our judgment for that of the trial court and make independent findings. [*People v Barbarich*, 291 Mich App 468, 472; 807 NW2d 56 (2011) (quotation marks and citations omitted).]

Stated differently, "[c]lear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

---

[2] If applicable, we encourage case evaluators to specifically note on case evaluation forms that any equitable claims were not subjected to case evaluation. This "best practice" would have avoided the case evaluation controversy before us today.

The city brought a common-law public nuisance action.

> A public nuisance is an unreasonable interference with a common right enjoyed by the general public. The term "unreasonable interference" includes conduct that (1) significantly interferes with the public's health, safety, peace, comfort or convenience, (2) is proscribed by law, or (3) is known or should have been known by the actor to be of a continuing nature that produces a permanent or long lasting, significant effect on these rights. [*Cloverleaf Car Co v Phillips Petroleum Co*, 213 Mich App 186, 190; 540 NW2d 297 (1995).]

We discern no error in the trial court's findings that all of Sayers' buildings presented current or possibly impending public nuisances. Abundant evidence supported that Building 945/959 significantly interfered with public health and safety. The earthen pit filled with hexavalent chromium was found in the basement of this building. Experts testified that the only way to safely and permanently remove the highly contaminated soil from under and around this building was to completely remove the building. While waiting for a decision regarding the removal of the building, several toxic and carcinogenic chemicals seeped through the ground and onto I-696, where these highly dangerous materials could be washed away into streams and lakes through stormwater drains. Several extensive remediation efforts were made in the meantime, but the danger persisted. Regardless of any other condition in Building 945/959, the leakage of these dangerous chemicals "significantly interfere[d] with the public's health" and "safety," rendering it a public nuisance that required abatement.

Building 901 was harder for the court to assess as it was divided into three sections and one section could, at that point, be remediated and used. Sayers challenges the treatment of the building as three distinct pieces. However, the city's expert structural engineer testified that the building had three different roof structures that separated the building into three distinct portions. Further, an aerial view clearly shows that the three sections have separate and identifiable "footprints." Although 901 was recorded as a single address, the safety of the structure had to be considered piecemeal.

And the evidence sufficed to find that two of the three Building 901 sections were currently public nuisances that required abatement. The court found the city's structural expert more credible than Sayers's, an assessment with which we may not interfere. See MCR 2.613(C); *Fletcher v Fletcher*, 229 Mich App 19, 24; 581 NW2d 11 (1998). The city's expert noted that the structure of building section 901C was extremely unstable, such that it could fall down in heavy winds. He opined that the building's foundation was not sufficiently buried and was likely to shift and lose strength when the ground froze. Moreover, significant portions of 901C's roof was missing and the heating system did not work. The city's expert stated that he had the same foundation concerns for the building section labeled 901A. The high probability that these building sections could collapse without notice posed a serious threat of danger to public safety and the court did not err in ordering their demolition to abate the nuisance.

The experts opined that it was possible that portion 901B could be saved and continue to be used. The city's expert noted some cracks in the wall and floor of 901B, but the roof deck and steel joists were still in good condition. However, we discern no error in the court's determination that dangers likely could arise during the demolition of portions 901A and 901C necessitating the

demolition of 901B as well. There already existed structural damage presenting a danger of collapse with tremors and shifting of nearby demolition. The court could have more specifically stated that 901B could become a public nuisance during demolition of 901A and 901C. But there is no need to return this issue to the trial court simply to more artfully rework the language of its judgment. The court's intention and factual conclusions are clear given the context.

We also discern no error in the court's finding that Building 901B and Building 925 could be deemed public nuisances in the near future as ground contamination tests continued. The experts testified that ground contamination samples would continue for years into the future in an ever-expanding ring extending from Building 945/959. That testing would reveal how far the toxic ground saturation spread. The fact that the soil was contaminated under Building 945/959 sufficed to require removal of those buildings. Should the toxic chemicals seep into the soil under Building 901B or Building 925, removal of that building would be required to safely and completely abate the nuisance as well. The court's order was directly supported by evidence that the radius of the ground contamination was still growing and the size of the public nuisance would continue to grow along with it. This evidence was not speculative or conjectural; it was based on current observations of the spreading danger. " '[A]n injunction may issue to prevent a threatened or anticipated nuisance which will necessarily result from the contemplated act, where the nuisance is a practically certain or strongly probable result or a natural or inevitable consequence.' " *Keiswetter v Petoskey*, 124 Mich App 590, 599; 335 NW2d 94 (1983), quoting *Falkner v Brookfield*, 368 Mich. 17, 23; 117 NW2d 125 (1962). Given the record evidence of a real danger, we have no ground to interfere with the trial court's factual findings.

## IV. ORDER OF DEMOLITION

Finally, Sayers challenges the trial court's selected remedy for abating the nuisance, specifically ordering demolition of Building 945/959 and the 901A and 901C portions of Building 901. "It is firmly established that nuisance abatement, as a means to promoting public health, safety, and welfare, is a legitimate exercise of police power and that demolition is a permissible method of achieving that end." *Bonner v City of Brighton*, 495 Mich 209, 229; 848 NW2d 380 (2014).

As noted in the previous section, abundant evidence supported that demolition of these buildings was necessary to protect the public health and safety. Experts testified that the soil underneath Building 945/959 was so contaminated that the groundwater would need to be pumped out for proper disposal indefinitely or the building had to be demolished so the soil could be safely and completely removed. Sayers contends that he should have been given the option to remedy the problem at his own expense. However, Sayers has been given such options since 2004, and he has never undertaken the work. Given his history of lawbreaking and noncompliance, ordering Sayers to take remediation efforts before bringing Building 945/959 up to code would not protect the public health and safety.

The court also did not err in ordering the demolition of 901A and 901C. Structural engineers inspected these buildings and found the foundations and structural supports so damaged that they could collapse at any time. Evidence established that government officials had notified Sayers of these issues several times since 1996, and he did nothing to rectify the conditions. He even failed to make remediation efforts after entering a consent order with the MDEQ. Evidence

-7-

of Sayers's complete disregard for government authority and his own agreements more than sufficed to support that a remedy short of demolition would have no impact. Sayers is not entitled to relief from the demolition orders issued by the court.

We affirm. The city of Madison Heights, as the prevailing party, may tax costs pursuant to MCR 7.219(A).

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Amy Ronayne Krause