*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* O O CLAUDIO-PEREZ, Minor.

UNPUBLISHED
April 27, 2023

No. 360356
Kalamazoo Circuit Court
Family Division
LC No. 18-000181-NA

ON REMAND

Before: MURRAY, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

## I. INTRODUCTION

In this matter, mother appealed the trial court's order terminating her parental rights to her son, OOCP, raising only two issues. First, mother argued that her plea of admission taken by the trial court was not knowingly, understandingly, and voluntarily made. Second, she argued that she did not receive reasonable efforts toward reunification. We rejected mother's arguments and affirmed the trial court's decision. *In re O O Claudio-Perez*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2022 (Docket No. 360356).

Mother subsequently obtained new counsel and filed an application for leave to appeal to the Supreme Court, and challenged, for the first time, the trial court's findings of statutory grounds to terminate her parental rights. The Supreme Court, in lieu of granting mother leave to appeal, remanded this case back to us pursuant to MCR 7.305(H)(1), instructing us "to review and address the trial court's decision finding statutory grounds to terminate parental rights under MCL 712.A19b(3)(c)(*i*), (c)(*ii*), and (j)." *In re O O Claudio-Perez*, 984 NW2d 215 (Mich, 2023).

Pursuant to this directive, we now address whether the trial court's decision finding statutory grounds to terminate mother's parental rights under MCL 712.A19b(3)(c)(*i*), (c)(*ii*), and (j) was proven by clear and convincing evidence. We affirm.

## II. BACKGROUND

-1-

In the interest of judicial efficiency, we assume the reader is familiar with the facts and conclusions laid out in our prior opinion. See *In re O O Claudio-Perez*, unpub op at 1-4. However, we will provide some additional facts in light of the new issue requiring resolution and in response to the concerns raised in Justice CAVANAGH'S concurrence. See *In re O O Claudio-Perez*, 984 NW2d 215 (CAVANAGH, J., concurring).

OOCP was removed from mother's care in April of 2018 due to her physical abuse and medical neglect of her medically fragile son, who suffered from a rare life-long condition called Ehlers-Danlos syndrome. Ehlers-Danlos syndrome affected the production of OOCP's connective tissues, making him highly susceptible to serious injury. Because of his condition, OOCP required extensive and frequent medical attention. Even the slightest inattention to his care could develop into more significant conditions, including blood vessels rupturing, blood not clotting, hypermobility of joints, instability of joints causing easy dislocations, scoliosis, tissue disease, eye problems, dental problems, and life-threatening organ problems. OOCP also had other medical conditions, including atrial septal defects, asthma, and developmental and speech delays.

OOCP was in the DHHS' care for over three years when the trial court ultimately terminated mother's parental rights on October 5, 2021. When OOCP was originally removed from mother's care, the goal was reunification. The record shows that the DHHS notified mother early on that she was expected to be present for OOCP's medical appointments and provided mother with a calendar detailing OOCP's upcoming medical appointments. As explained in our prior opinion, however, "on numerous occasions, mother discussed and requested, at her own accord, the possibility of changing the permanency goal from reunification to guardianship as early as May 4, 2018." *In re O O Claudio-Perez*, unpub op at 7. Although mother herself pushed for the goal change from reunification to guardianship, the DHHS held off on changing the goal with the court until mother and OOCP obtained their green cards to avoid the risk of deportation.[1]

Mother's engagement in the case service plan was practically nonexistent for the first two years that OOCP was in the DHHS' care. Although the DHHS caseworker admitted that with the goal of guardianship in mind, they did not encourage mother to attend OOCP's medical appointments, the record shows that mother was still notified of these appointments and permitted to attend. It was not until October of 2020 that mother engaged in the case service plan. The following month, the DHHS filed its supplemental petition to terminate mother's parental rights, asserting that mother had not participated or shown any interest in OOCP's medical care since his removal. The DHHS further asserted that she had never inquired about his health progress or condition and scarcely attended his medical appointments despite being notified of them. The DHHS noted that prior to October of 2020, mother attended no more than two of OOCP's weekly physical and occupational therapy sessions.

The trial court terminated mother's parental rights on October 5, 2021, three years and five months after DHHS filed its petition, finding that mother did not fully comprehend the abuse that she inflicted on OOCP or the significance of his medical condition and disregarded ample

---

[1] DHHS also considered filing a supplemental petition changing the goal to adoption as early as September of 2018, but the department held off on changing the goal until mother and OOCP obtained their green cards to avoid the risk of deportation.

opportunities provided to her to learn to care for OOCP's needs and how to properly discipline him. The trial court based its holding, in large part, on its findings related to mother's efforts after she engaged in the case service plan in October of 2020. The court found that although mother began attending most medical appointments, she did not otherwise partake in his care plan and failed to educate herself about OOCP's condition. The court relied on the record and found that mother did not ask questions to OOCP's physicians nor inquire about OOCP's progress or treatment while attending his medical appointments. The court also found that mother failed to demonstrate an ability to manage and track OOCP's medical appointments without relying on the caseworkers. The court found that mother failed to promptly schedule OOCP's appointments, citing one instance on June 3, 2021, where OOCP's Ears Nose and Throat (ENT) doctor canceled OOCP's appointment to review his hearing test because mother failed to schedule the hearing test.

## III. STATUTORY GROUNDS

Mother argues that the trial court erred by terminating her parental rights under MCL 712.A19b(3)(c)(*i*), (c)(*ii*), and (j), which permit termination of parental rights under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Before terminating a respondent's parental rights, the trial court must find by clear and convincing evidence that at least one statutory ground for termination exists. *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). To terminate parental rights, only one statutory ground for termination needs to be satisfactorily proven. MCL 712A.19b(3).

## A. APPLICATION

After carefully reviewing the record, we hold that the trial court did not err in terminating mother's parental rights under MCL 712.A19b(3)(c)(*i*). There is no dispute that more than 182

days elapsed between the issuance of the initial dispositional order and the termination of mother's parental rights, and that mother's medical neglect of OOCP was one of the conditions that led to the adjudication.[2] Equally clear from the record was the court's determination that mother had not demonstrated the ability to properly care for her medically fragile son suffering from Ehlers-Danlos syndrome.

Mother faults her caseworkers for her absence at OOCP's medical appointments, arguing that for the first two years, the caseworkers told her that she did not need to attend his medical appointments. The trial court acknowledged the caseworkers' missteps during the first two years of this case but found that mother was well aware of the seriousness of OOCP's medical condition[3] and given ample opportunity to participate in his care but chose not to be involved. The trial court found credible the testimony of Vanessa Guerrero, mother's caseworker, who testified at the beginning of the case that although she offered medical training to mother, mother did not attend. Even still, the trial court's decision finding statutory grounds to terminate mother's parental rights was primarily supported by its findings related to mother's conduct after she reengaged in the case service plan in October of 2020.

The trial court did not clearly err when it found clear and convincing evidence to terminate mother's parental rights, as mother's medical neglect of OOCP continued even after she began attending his medical appointments. The trial court found that mother had done nothing to educate herself on OOCP's fragile medical condition. The court relied on BCS case manager Andrea Vojtko's court addendum, indicating that she never observed mother speak with OOCP's physical and occupational therapist about OOCP's therapy nor ask questions about his treatment plan or whether he was making any progress. The record evidence also proves that mother failed to meaningfully participate in his care and improve her understanding of his unique medical needs, including several reports from OOCP's foster parents about mother's lack of involvement or obvious disinterest in OOCP's medical care while attending his other medical appointments, claiming that mother did not inquire about details or ask questions to his doctors. The foster parents claimed that during medical visits that they attended with mother, mother did not ask questions to the doctors or inquire about details, and that mother was usually more engaged with OOCP than with the medical providers. Each one of OOCP's medical appointments presented an opportunity for mother to learn more about his severe medical condition and demonstrate her

---

[2] Mother's physical abuse of OOCP was another condition that brought OOCP within the court's jurisdiction. The trial court also concluded that termination was proper under MCL 712.A19b(3)(c)(*i*) for mother's failure to rectify that issue, finding that mother did not fully comprehend the abuse she inflicted on OOCP. However, the trial court erred in that finding, as the record is void of any instance of physical abuse by mother since OOCP was removed from her care in April of 2018.

[3] In fact, mother was well aware, for many years preceding the DHHS' petition, of the seriousness of OOCP's medical condition and his need for consistent medical care and attention. The record shows that mother learned that OOCP had Ehlers-Danlos sometime while she was in Arizona from 2015 to 2017. Furthermore, in that time, CPS provided mother with two Duty to Warn letters detailing the seriousness of OOCP's condition and his need for prompt medical care.

ability to address his needs. However, mother failed to actively engage, beyond mere attendance, in OOCP's medical care and treatment.

The record shows that mother could not comprehend the magnitude of OOCP's life-long medical conditions and his need for recurring and consistent medical care. Ms. Guerrero testified that despite mother's recent efforts to become more involved in OOCP's care, her understanding of OOCP's condition remained superficial, in that she did not comprehend that Ehlers-Danlos was a life-long condition requiring a significant amount of supervision. In fact, in October of 2020 and in January of 2021, mother inquired about when OOCP's need for physical and occupational therapy would end, failing to acknowledge that therapy would be a lifelong circumstance. Even more, Ms. Guerrero testified at the termination hearing that mother had recently asked her what OOCP's condition was called.

The trial court also found that mother had not demonstrated an ability to keep track of and schedule OOCP's medical appointments independently and instead relied on the caseworkers. The DHHS delegated the responsibility of managing and scheduling OOCP's appointments to mother following her request for more accountability in this regard. While Ehlers-Danlos syndrome could not be cured, the extent of damage could be dramatically decreased by the type of care received. Despite the importance of providing OOCP with prompt medical care, the record shows that mother required repeated reminders from her caseworkers to schedule or attend OOCP's medical appointments.

Mother argues that the trial court erred by finding that OOCP's June 3, 2021, ENT doctor appointment to review his hearing test was canceled due to mother's failure to schedule the hearing test. The trial court relied on the case worker's report, which explicitly provided that OOCP's ENT appointment to review the hearing test results had to be canceled because "[mother] never called to schedule" the prerequisite hearing test. Mother alleges that the cancellation occurred only because the hearing testing facility did not have the appropriate referral slip, directing us to testimony concerning events that occurred *after* the June 3, 2021, canceled appointment. Mother first points to Ms. Vojtko's testimony that on June 30, 2021, Ms. Vojtko instructed mother to call the ENT doctor to find where the referral for OOCP's hearing test had been sent, so that mother could schedule OOCP's hearing test. Ms. Vojtko also testified that rather than taking the initiative, mother redirected the task to Ms. Vojtko. Mother also points to Ms. Vojtko's testimony that on July 27, 2021, mother informed her that the ENT doctor's office would not schedule the hearing test and that mother did not understand why. Ms. Vojtko further testified that when she called the ENT doctor, she learned that a referral simply needed to be resent for the hearing test to an audiology facility. Ms. Vojtko noted while giving her testimony that mother still had not scheduled the hearing test despite OOCP's ENT doctor having recommended the hearing test several months prior and that she provided mother with multiple reminders.

Clearly, Ms. Vojtko's testimony related to discussions with mother on June 30 and July 27 that post-dated the initial June 3 appointment that was canceled due to mother's neglect to schedule it promptly. More significantly, Ms. Vojtko's testimony reveals mother's incapability of handling simple tasks and that mother instead significantly relied on her caseworkers to help her overcome even the smallest barriers to managing OOCP's treatment plan. The record also demonstrates this point. On June 30, 2021, Ms. Vojtko met with mother to assist her with calendaring and scheduling OOCP's upcoming medical appointments. Mother did not have OOCP's upcoming appointments

written down in her calendar, nor did she have the contact information for OOCP's providers. Instead, she relied on Ms. Vojtko for this information. According to Ms. Vojtko, she assisted mother with calling OOCP's physicians but "[w]hen it was necessary to leave voicemails for the doctors, [she] encouraged [mother] to speak during the voicemails, but [mother] declined to speak and asked [her] to leave the voicemails instead." At this meeting, Ms. Vojtko also tasked mother with following up with the ENT and Kellogg Eye Center. However, on July 6, 2021, mother informed Ms. Vojtko that she still did not follow up with the ENT doctor or the Kellogg Eye Center. Mother struggled with communicating with OOCP's providers when scheduling his appointments and hardly took the initiative to complete these tasks on her own.

The record further shows that mother even struggled with managing and keeping track of the appointments she had scheduled herself. For instance, following several complaints from the foster mother that mother was not ensuring the proper nutrition for OOCP during parenting time visits, mother made an appointment with a nutritionist. Upon arrival, however, the office staff informed mother that she had canceled the appointment, presumably by accidentally canceling it when mother received the appointment reminder notification. The office staff also informed mother that she had scheduled the appointment under her own name, and not OOCP's, and so the doctor's office did not even have OOCP's medical history or any other information necessary for the doctor to assist mother on a nutrition plan for OOCP. The record further shows that on July 29, 2021, mother asked Ms. Vojtko if OOCP had any upcoming appointments, although it was mother's responsibility to manage and track OOCP's medical appointments. Not only did Ms. Vojtko have to remind mother of OOCP's upcoming appointments, which mother scheduled herself, but also that OOCP had ongoing weekly physical and occupational therapy appointments. Moreover, when Ms. Vojtko requested to review mother's calendar to ensure that she had written down all the appointments, mother avoided the requests.

Based on these findings, we hold that the trial court did not err in finding that there was no reasonable likelihood that mother's barriers to reunification would be rectified within a reasonable time, and, therefore, termination was proper under MCL 712.A19b(3)(c)(*i*). The trial court properly found that mother had not demonstrated the ability to properly care for OOCP's unique and extensive medical needs, as the record proves that mother failed to educate herself about her son's condition and establish that she was capable of managing his treatment plan. Mother missed ample opportunities to rectify the barriers that led to adjudication and was in no better of a position to care for her son by the time of the termination hearing than she was when OOCP was initially removed from her care more than three years prior. See *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009) (concluding the trial court did not clearly err when it terminated the mother's rights under (c)(*i*) because "the totality of the evidence amply supports that she had not accomplished any meaningful change in the conditions existing by the time of the adjudication").

And, for these same reasons, we also find that the trial court did not err by finding that termination was proper under MCL 712.A19b(3)(j), as there was a reasonable likelihood that, based on mother's medical neglect, OOCP would be harmed if he was returned to mother's care. The trial court properly found that with regard to OOCP's medical care, despite having attended more of his medical appointments, mother either did not care or did not comprehend the seriousness of his condition and his need for prompt medical care. OOCP's medical condition distinguishes him from the average healthy child. Because of his condition, he required extensive and frequent medical care, and even the slightest inattention to his care could result in significant

consequences. The evidence confirmed that mother did not have the capacity to attend to his medical needs, and her lack of medical knowledge of her son's condition posed a significant risk to OOCP's health and whether he would receive consistent treatment. Mother also failed to manage even the simplest tasks, such as tracking and scheduling his appointments, and she struggled to overcome barriers as small as calling the physician's office to request a new referral. In consideration of OOCP's unique and serious medical condition, we hold that the trial court did not err by finding that OOCP would likely be harmed if he was returned to mother's care. We are not left with a definite and firm conviction that a mistake has been made. *In re LaFrance Minors*, 306 Mich App 713, 723; 858 NW2d 143 (2014).

We hold that the trial court did not err in finding that statutory grounds to terminate mother's parental rights under MCL 712.A19b(3)(c)(*i*) and (j) was proven by clear and convincing evidence. As only one statutory ground is required to terminate mother's parental rights, it is unnecessary to address whether the trial court properly found statutory grounds for termination under MCL 712A.19b(3)(c)(*ii*). See *In re Frey*, 297 Mich App 242, 244; 824 NW2d 569 (2012) ("It is only necessary for the DHS to establish by clear and convincing evidence the existence of one statutory ground to support the order for termination of parental rights."). Moreover, as the Supreme Court only instructed us to review and address the trial court's decision finding statutory grounds to terminate parental rights, we are not required to consider mother's remaining arguments, including her challenge to the trial court's decision that termination was in OOCP's best interests.

Affirmed.


/s/ Christopher M. Murray
/s/ Colleen A. O'Brien
/s/ James Robert Redford

-7-