*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. E. VROMAN, Minor.

UNPUBLISHED
July 20, 2023

No. 363535
Calhoun Circuit Court
Family Division
LC No. 2021-002982-NA

Before: PATEL, P.J., and BOONSTRA and RICK, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court order terminating her parental rights to the minor child, AV, under MCL 712A.19b(3)(a)(*ii*) (child was deserted for 91 or more days), MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), and MCL 712A.19b(3)(j) (child will be harmed if returned to the parent).[1]  We affirm.

## I.  FACTUAL BACKGROUND

An initial petition was filed in this case on October 26, 2021.  The petition alleged that on August 2, 2016, the Battle Creek Police Department (BCPD) and Children's Protective Services (CPS) conducted a domestic violence investigation involving both mother and father.  The petition further alleged that on or about June 23, 2017, a CPS case was opened in Florida after AV drowned in a bathtub while mother was distracted by her phone in another room.  Miraculously, CPR was performed, and AV was revived.  The petition further alleged that on February 25, 2021, mother abandoned AV in the presence of police.  On that day, the police were called because mother was seen getting into other people's cars at the trailer park where she lived.  When police approached her, mother went into her mobile home.  After trying to contact her, the police realized that the side door was open and AV was alone in the house.

The trial court assumed jurisdiction at the adjudication and dispositional hearing held on November 30, 2021.  The trial court assumed jurisdiction over AV on the basis of an "unfit home

---

[1] Respondent-father's rights to the minor child were terminated in an earlier proceeding.  He has not appealed that decision and does not participate in this appeal.

due to neglect, cruelty, drunkenness, criminality or depravity, failure to provide necessary care." AV was placed with her stepmother and a half-brother. A case service plan was put in place, and mother was ordered to comply with the criteria, including substance abuse and mental health treatment. The court also granted mother supervised parenting time with AV.

Mother ultimately failed to adequately comply with the case service plan, and petitioner filed a petition to terminate mother's parental rights. A three-day termination hearing was held in August and September 2022. Petitioner presented testimony from a CPS worker, who stated that petitioner offered mother a wide variety of services and resources, including psychological evaluations, supervised parenting time, drug screenings and substance abuse treatment programs, mental health services, and family outreach. Mother submitted to a psychological evaluation, and was diagnosed with a mixed personality disorder with predominate borderline features. Petitioner recommended that mother participate in a wide-array of services, including: substance abuse treatment, relapse prevention planning, and individual therapy. Mother was also recommended to continue with psychiatric treatment, maintain medication compliance, participate in abuse and neglect therapies, create an external support system, achieve and maintain sobriety, maintain housing and a steady source of income, and further strengthen her relationship with AV.

Of the 55 parenting time visits that were scheduled, mother attended 32. AV's CPS worker testified that mother's last supervised parenting time visit was on May 10, 2022. Since May 2022, the worker had a few conversations with mother asking if she would like to visit AV. As of July 2022, mother had moved to Colorado and was living with a boyfriend. The CPS worker stated that mother explained she had not been consistently visiting AV because she believed she had been "human trafficked and that if she were to have contact with [AV] that [AV] would be at great risk for falling under this same situation." A trauma assessment that took place in February 2022 identified the parent-child bond as "insecure and ambivalent."

Regarding substance abuse treatment, mother completed a 14-day substance abuse treatment program in December 2021. A CPS worker assigned to the case testified that mother's compliance with drug screening was "very minimal" between January and March 2022. Mother was also referred to a 90-day inpatient substance abuse program, but did not complete it. She voluntarily left another program a few days after she was admitted. Mother was subjected to three random drug screenings. She completed two out of three, and tested positive for methamphetamine both times. AV's CPS worker stated that mother never maintained sobriety and that she was "very active in her substance abuse addiction throughout the entirety of the case."

Finally, regarding mental health treatment, mother testified that she attended group and individual therapy, and that her psychiatrist had taken her off all her psychiatric medications. When the termination hearing occurred, she had not yet been scheduled for another psychiatric evaluation.

At the close of testimony, the trial court stated:

Regarding the services, as I stated it's been [2]89 days, she has not made progress. We are exactly where we were at the beginning of this case and due to the period of time, maybe even a little bit worse. She still does not have the parenting skills,

-2-

she has not complied with the psychological, she does not have the substance abuse treatment prevention and period of stability.

* * *

And I also want to indicate—you know, she says she's not coming back to Battle Creek because of her issues and substance abuse, but she's also not coming back to Michigan cuz [sic] she has a current bench warrant, she has an active bench warrant currently for her arrest that was in the case that the Court took judicial notice of. So, not only—and—and I'll note that normally courts don't allow people to appear via Zoom when they have a bench warrant, but it's a significant thing in this case that I hear her side of the story. And I have strongly considered everything she had to say and let her participate in these proceedings despite the fact that she's had a bench warrant throughout this entire proceeding. So, I want to make it clear, the Court has done everything to engage and allow [mother] to participate.

The trial court found that "reasonable efforts have been made" toward reunification, and that under MCL 712A.19b(3)(a)(ii), "there is clear and convincing evidence that in this case the child was deserted by the mother for 91 or more days." The trial court further found:

Under [MCL 712A.19b(3)(c)(i)], "the parent was a respondent under this chapter, 182 or more days have elapsed and there is clear and convincing evidence that the conditions that lead to adjudication continue to exist." It is not reasonable considering this child's age and her history that you've heard me gone [sic] through, that this child wait for permanence any longer. Mother is not going to fix this in six months.

* * *

So, the Court will, in fact, find that under [MCL 712A.19b(3)(c)(i)], 182 days or more have lapsed and since the initial dispositional order and there is no likelihood that the conditions will be rectified within a reasonable amount of time considering the fact that this child has absolutely lived a chaotic, unstable, and very troubling life in her six young years.

The Court will then move on to [MCL 712A.19b(3)(j)], "reasonable likelihood the child will be harmed based on the conduct or capacity of the child if returned to the parent." There is no indication that mom is stable, that she's had her psychiatric intervention. She says, 'well, they took me off my medicine,' yes, they took you off your medicine, they took you off your medicine because you were using drugs at the same time as your medicine, and they had to clear you out before they could restart and then she missed her appointment. And so, there's no doubt in this Court's mind that she still needs that psychiatric evaluation.

Additionally, the trial court found, by clear and convincing evidence, that it was in AV's best interests to terminate mother's parental rights. The trial court explained:

-3-

[AV] is bonded, she's finally doing well. Looking at her psychological, Dr. Haugen stated that she needed a clear, stable, and structured environment, I think this is probably the first time [AV has] ever had that. It needs to provide her with support and well-defined que's [sic] as to what constitutes appropriate behavior. She needs to experience a warm and responsive environment over, quote, "a long period of time in order to alter her current beliefs and internalize the adult world as consistent and capable of meeting her needs." Because she doesn't—she doesn't think this world's safe, she doesn't think adults can meet her needs.

\* \* \*

This six-year-old little girl has been through enough in her life in this timeline and if this case was just about mom, and what mom needed, it would be a different situation. This case is not, it's about what is best for [AV] and what can [AV] tolerate any longer and she simply cannot tolerate to be part of this system any longer, she simply cannot tolerate waiting for mom to get her life together, to get clean and show up and be consistent. There's no indication that that can happen in a reasonable amount of time.

\* \* \*

Considering everything in these circumstances, the Court has no choice in this matter to give this young girl permanency and to terminate the parental rights of the mother in the best interests of the child.

Accordingly, the trial court entered an order terminating mother's parental rights. Mother now appeals to this Court.

## II. ANALYSIS

### A. STATUTORY BASES

On appeal, mother argues that the trial court clearly erred by finding statutory grounds for termination of her parental rights and by concluding that termination was in the child's best interests. We disagree.

"A court may terminate a respondent's parental rights if one or more of the statutory grounds for termination listed in MCL 712A.19b(3) have been proven by clear and convincing evidence." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Furthermore, "once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *Id*. We review the trial court's determination for clear error. *Id*. "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. at 41 (quotation marks and citation omitted). We give "deference to the trial court's special opportunity to judge the credibility of the witnesses." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009).

The trial court first found that statutory grounds existed to support termination under MCL 712A.19b(3)(a)(*ii*), which states that a trial court may terminate parental rights when the "parent has deserted the child for 91 or more days and has not sought custody of the child during that period." The record indicates that mother left AV with her paternal grandparents in February 2021. Between February 2021 and October 2021, mother's whereabouts were largely unknown. This period of abandonment occurred before the filing of this petition on October 26, 2021. On October 14, 2021, AV's paternal grandmother reported to CPS that mother came over to her house "infrequently to see [AV]." As no dates were given to indicate when mother came to see AV, it is impossible to know whether a consecutive 91-day period of abandonment occurred during this time. Regarding the second period of alleged abandonment, mother's last supervised visit with AV was held on May 10, 2022, and the first day of the termination of parental rights hearing was held on August 31, 2022. Although mother did not visit AV during this period, she attended a permanency planning hearing on May 27, 2022, and on June 9, 2022, mother called her attorney from a phone associated with a rehabilitation program in Grand Rapids that she had checked herself into. Furthermore, mother enrolled in group and individual therapy upon moving to Colorado sometime between July and August 2022.

In *In re Laster*, 303 Mich App 485, 492; 845 NW2d 540 (2013), superseded by statute on other grounds as stated in *In re Ott*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 362073), this Court concluded:

> With regard to subdivision (a)(*ii*), there was not clear and convincing evidence that respondent-mother had deserted the children for 91 days and had not sought custody during that period. Although respondent-mother had previously left the children with their maternal grandmother for an extended period of time, that occurred approximately one and a half years before the filing of the termination petition. And after that time, respondent-mother did have contact with the children and did participate in some, although very few, of the court hearings and required services.

Like the respondent in *Laster*, mother participated in some of the court hearings and required services throughout the proceedings. Mother did not need to participate in every court hearing and required service; rather, she only needed to participate in a few services to avoid abandoning AV within the meaning of MCL 712A.19b(3)(a)(*ii*). The record indicates that mother participated in at least a few of the court hearings and required services. Therefore, we conclude that mother did not abandon AV, and the trial court erred by concluding that evidence was presented to support termination under MCL 712A.19b(3)(a)(*ii*).

The record evidence does not support the trial court's finding that mother deserted AV for 91 or more days and has not sought custody during that period. Thus, the trial court's findings pursuant to MCL 712A.19b(3)(a)(*ii*) were clearly erroneous. However, because the petitioner need only establish one statutory ground for termination of a parent's parental rights, a trial court's error involving one statutory ground will be harmless if the trial court properly found another ground for termination. *In re Powers Minors*, 244 Mich App 111, 118-119; 624 NW2d 472 (2000). We conclude that reversal is not warranted because sufficient evidence supported the court's termination of mother's parental rights under MCL 712A.19b(3)(c)(*i*) and MCL 712A.19b(3)(j).

Under MCL 712A.19b(3)(c)(*i*), a trial court may terminate parental rights when "the conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." This Court has held that termination is proper when "the totality of the evidence amply supports that [respondent] had not accomplished any meaningful change in the conditions existing by the time of the adjudication." *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). In this case, the conditions that led to adjudication were: (1) lack of parenting skills; (2) mother's abandonment of AV; (3) substance abuse; (4) lack of stable housing; and (5) mental health concerns.

With respect to parenting skills, mother maintains that her parenting skills have improved. She contends that the June 2017 CPS case involving AV's drowning was resolved in her favor and should not be used as a basis for terminating her rights. However, she overlooks that her lack of parenting skills extends past the drowning incident. From the start of this case until June 2022, mother attended only 32 of 55 supervised parenting time visits. The last visit with AV was May 10, 2022. Even though mother still had supervised parenting time for over three months after May 10, 2022, she did not attend those visits. Further, although AV's CPS worker testified that there were "very good pieces" to these visits, the visits were largely "motivated by mom's desire to have [AV] give her acclimation [sic], give her hope." The worker explained that there were "times when [mother] will say to [AV], '[AV], momma's not feeling good right now, I'm feeling scared, would you hug me?' And so, [AV] will hug her." Additionally, mother would frequently bring up inappropriate adult matters with AV. Ultimately, there was little evidence that mother's parenting skills improved, and thus, the trial court did not clearly err by determining that mother did not accomplish "any meaningful change" regarding parenting skills.

With respect to abandonment, although she did not abandon AV within the meaning of MCL 712A.19b(3)(a)(*ii*), mother left AV in Michigan in July 2022 when she moved to Colorado. Mother never explained why she stopped visiting AV during this time even though she knew that Zoom meetings were a possibility. The trial court had no idea where mother was and did not have the ability to locate her until she came to the termination hearing on August 31, 2022. The record does not show that mother's claim that she was a victim of human trafficking was ever substantiated beyond mother's own allegations. Therefore, the trial court did not clearly err by determining that mother did not accomplish "any meaningful change" regarding her propensity for abandoning AV.

With respect to substance abuse, there is no indication that mother benefited from substance abuse treatment. She completed one 14-day substance abuse treatment program in December 2021. She was referred to a lengthier 90-day substance abuse treatment program in April 2022, but never completed it. Further, mother voluntarily left another substance abuse program. She was called to complete three random drug screenings prior to termination. She completed two of the three screenings, and tested positive for methamphetamine both times. Mother did not complete additional drug screens. Additionally, there is no evidence that she had a relapse prevention plan in place. Based on the record before us, we conclude that the trial court properly concluded that mother did not accomplish "any meaningful change" regarding substance abuse.

With respect to stable housing, the trial court stated:

> [Mother] is living with a third party who, I agree with—with the [guardian ad litem] and the Prosecutor in this matter, that third-parties [sic] significant other recently overdosed. We have no indication that that's an appropriate place, knowing that there was a recent overdose. Generally, when there are drugs in the home, it's not a good environment. This person overdosed, his—his—his significant other overdosed and that's where she[]went to get clean. Most of your treatment programs will tell you to stay away from former contacts that are users. And I hope it is a good location, but the Court has no proof or evidence or anything that indicates that's an appropriate place or housing or that it's not simply a—a temporary situation. Moms [sic] indicated no way that this is a permanent situation for her.

On this record, the trial court did not clearly err by determining that mother fell short of accomplishing "any meaningful change" regarding stable housing.

Finally, with respect to mental health concerns, mother completed a psychological evaluation in January 2022 with Dr. Randall Haugen. It was recommended that she participate in individual therapy, continue with psychiatric treatment, and maintain medication compliance. However, mother was not taking any medications at the time of the termination hearing, and she explained that her psychiatrist took her off her medications sometime between April and June 2022 "to get [her] sober and with a clear mind" before she could be reevaluated. Mother explained:

> I think [the psychiatrist's]—[the psychiatrist's] point was to get me off of all the medications and then off the drugs and out of those situations and then for me to get re-evaluated which is what I'm going further to do, to see what exactly were the problems that needed actual medication for them and how much of them were situational.

Mother missed her first appointment for a reevaluation and had not been scheduled for another appointment. Although she argues that "her mental wellbeing improved to the point where she was taken off of her psychiatric medications," the trial court called this a "red herring." Further, the trial court stated:

> The reports indicate that no[t] only should she have the psychiatric evaluation, but that she is readily [sic] failed to take her medication for years. In addition, the evidence indicated that she, in fact, had an appointment to evaluate her need for medication and she missed that appointment, and she has not engaged in an appointment since then to determine.

> \* \* \*

> [The psychiatrist] took [mother] off [her medication], she was—she was actively using and her tests had been positive at the time, for Methamphetamine. Methamphetamine and mental health medication are not a great mix, so of course they're not gonna [sic] continue to put her in a state where she's mixing medication and street drugs.

-7-

Here, the trial court did not clearly err by determining that mother did not accomplish "any meaningful change" regarding her mental health. See *id*.

For all the foregoing reasons, the trial court's findings pursuant to MCL 712A.19b(3)(c)(*i*) were not clearly erroneous. The trial court did not err by terminating mother's rights on this basis.

The trial court also found statutory grounds supported termination under MCL 712A.19b(3)(j), which allows for the termination of parental rights when "there is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." In this case, the record evidence supports the trial court's finding that there is a reasonable likelihood, based on mother's conduct and capacity, that AV would be harmed if returned to mother's home. Specifically, the trial court found that "there is no indication that [mother] is stable, that she's had her psychiatric intervention," and mother "still does not have the parenting skills, she has not complied with the psychological, she does not have the substance abuse treatment prevention and period of stability." Moreover, regarding mother's housing, "the Court has no proof or evidence or anything that indicates that's an appropriate place or housing or that it's not simply a—a temporary situation."

Additionally, mother's "failure to substantially comply with a court-ordered case service plan is evidence that return of the child to the parent may cause a substantial risk of harm to the child's life, physical health, or mental well being." *In re Trejo*, 462 Mich 341, 346 n 3; 612 NW2d 407 (2000) (quotation marks and citation omitted). Mother's compliance with drug screening was "very minimal," and she tested positive for methamphetamine twice. Although she allegedly became sober in July 2022 and started new therapies in August 2022, the trial court reasoned:

> The circumstances of [mother's] drug use, while she may have short periods of being clean, her history is long and evolved and it indicates that she has been using for a significant period of time and to think that she can just jump in and, wow, she's gonna [sic] go live with her best friend who unfortunately and—and regrettably overdosed and she's gonna [sic] live with his significant oth—or her significant other and now that's gonna [sic]—you know, fix everything, it—it's not a reasonable expectation that she's in any way, shape or form—she has not done her drug screens, she has not done her substance abuse treatment.

Additionally, mother has yet to be reevaluated for psychiatric medication. The trial court stated that there was "no doubt in [its] mind that [mother] still needs that psychiatric evaluation." Because her unstable lifestyle and living environment showed little improvement, and given that mother failed to substantially comply or benefit from services, the trial court did not err by finding clear and convincing evidence to terminate her parental rights pursuant to MCL 712A.19b(3)(j).

## B. BEST INTERESTS

Mother also argues that the trial court clearly erred by concluding that termination was in AV's best interests. We disagree.

"In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). At the best-interest stage of the proceeding, the trial court's focus is on the child, not the parent. *In re Moss*, 301 Mich App 76, 81; 836 NW2d 182 (2013). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *Id*. at 90.

In this case, the trial court considered mother's history of substance abuse, mental health problems, and history of being involved in abusive relationships. The trial court acknowledged that mother testified that "she's the best she's been in years". However, mother still did not reach out to AV and "literally had to be hunted down to even participate in this matter."

Regarding AV's placement in a preadoptive foster home, the trial court stated that AV "is bonded, she's finally doing well. Looking at her psychological, Dr. Haugen stated that she needed a clear, stable, and structured environment, I think this is probably the first time this childs [sic] ever had that." Regarding AV's relationship with mother, the trial court stated that AV "acknowledged and [was] exposed to a high degree of conflict. She talked about the alcohol and— and the substance abuse. She has not internalized her parents as being safe and consistent and able to meet her needs on a regular basis."

Mother argues that the trial court neglected to consider previous testimony from AV's CPS worker that AV and mother had "a very close daughter, mother bond" and were "like two peas in a pod." However, mother overlooks that the worker later testified that, although there were "very good pieces" to parenting time, the time was "motivated by mom's desire to have [AV] give her acclimation [sic], give her hope." Additionally, a trauma assessment that took place in February 2022 identified the parent-child bond as "insecure and ambivalent." Moreover, the trial court stated that this case is "about what is best for [AV] and what can [AV] tolerate any longer and she simply cannot tolerate to be part of this system any longer, she simply cannot tolerate waiting for mom to get her life together, to get clean and show up and be consistent." The trial court did not clearly err by finding that termination of mother's parental rights was in AV's best interests, and therefore, the trial court did not err by terminating mother's parental rights.

Affirmed.

/s/ Sima G. Patel
/s/ Mark T. Boonstra
/s/ Michelle M. Rick