*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CAMPOS-PALACIOS, Minors.

UNPUBLISHED
December 10, 2025
10:04 AM

No. 374553
Kalkaska Circuit Court
Family Division
LC No. 23-4702-NA

Before: YATES, P.J., and BOONSTRA and YOUNG, JJ.

PER CURIAM.

Respondent-father[1] appeals by right the trial court's order terminating his parental rights to his twin minor children, ICP and ACP. We affirm.

## I. PERTINENT FACTS AND BEHAVIORAL HISTORY

Respondent is the biological father of the children. In July of 2023, Children's Protective Services (CPS) investigated a complaint that respondent and an unidentified woman[2] had been involved in a single-vehicle automobile accident with the children in the vehicle, and had fled the scene. Petitioner, Department of Health and Human Services (DHHS), filed a petition seeking removal of the children in July of 2023. Relevant to respondent, DHHS alleged that it was unknown whether he resided with the children and their mother. Further, respondent had been

---

[1] Respondent is the biological father of the minor children at issue. He was originally designated as a non-parent respondent in this case, as we will discuss. The children's presumptive legal father and mother were both respondents below. After DNA testing revealed that the presumptive legal father was not the biological father of the children, he was dismissed from the case by stipulation. The children's mother voluntarily released her parental rights to the children at the beginning of the termination trial. Neither the presumptive legal father nor the mother are parties to this appeal. We will therefore refer to appellant simply as "respondent."

[2] The children's mother told police that her cousin had been driving the vehicle, but there was significant evidence that the children's mother had herself been driving.

arrested on an outstanding warrant after seeking medical attention for injuries sustained in the accident. Respondent had refused a drug screen. The petition also alleged that respondent had a criminal history that included substance use, obscene conduct, and two felony sexual assault convictions, including at least one with a victim under the age of thirteen. The trial court authorized the petition, and the children were placed with a maternal relative.

Respondent was initially designated a non-parent respondent in this matter, as the children's mother was then married to another man, AER, and had been when ICP and ACP were born. All respondents agreed that AER was not the biological father of ICP and ACP, and AER and the children's mother were in the process of divorcing. Respondent had signed the children's birth certificates and an affidavit of parentage. After DNA testing confirmed that AER was not the children's biological father, he was dismissed from the case.

Respondent entered a plea of admission to the trial court's jurisdiction on January 30, 2024. Specifically, respondent admitted that he lacked stable and appropriate housing for his minor children. Respondent stated that he was working on replacing identification documents, including his driver's license, that had been stolen from him. The trial court accepted respondent's plea and ordered that respondent comply with the case service plan he had previously signed. The case service plan required respondent to obtain and maintain appropriate housing, receive a psychological evaluation and follow the recommendations from the evaluator, complete a substance abuse assessment, and participate in random drug screening.

Respondent completed a psychological evaluation and a substance abuse assessment. However, respondent did not comply with the recommendations from his psychological assessment that he receive counseling and possibly medication. Respondent is from Nicaragua. Although his exact immigration status was not specified in the record of these proceedings, he appeared to have had some trouble accessing certain services as a result of either his immigration status, the loss of his identifying documents, or a combination of the two. For example, at a permanency planning and review hearing in June of 2024, his caseworker stated that respondent had informed her that a counseling agency to which he had been referred would not take him as a patient, because he only had "Medicaid for emergencies," although respondent had also stated that he did not "have Medicaid." The caseworker testified that there may have been a communication barrier between respondent and the agency, and that she had offered to take him to the agency herself to resolve the issue, but respondent would not show up for scheduled meetings or return her calls.

Petitioner filed a supplemental petition, seeking termination of respondent's parental rights, in October of 2024. At a review hearing in December 2024 (at which respondent did not appear, despite being notified of it and offered transportation), his caseworker testified that respondent had recently informed her that he was "going to go through the immigration office in Traverse City for counseling services"; however, he did not provide the address and actual name of the agency he was referring to, or provide a release of information so that petitioner could be informed if he was receiving services. After this hearing, the trial court authorized the supplemental petition seeking termination of respondent's parental rights.

A bench trial was held in February 2025.[3]  A parenting time and support specialist testified that respondent had been referred to Family Supportive Services of Northern Michigan for supportive visitation services; however, respondent only had two supported visitations with the children.  Both visits took place at the Traverse City public library.  The specialist testified that respondent was late for the first visit despite the specialist providing him with transportation.  Additionally, respondent was not receptive to suggestions regarding his approach to parenting and used vulgar and sexual language with the children and with DHHS workers.  On the second visit, although respondent was on time and had brought snacks for the children, respondent became enraged when a security guard asked him not to give his children snacks in a particular area of the library.  Respondent yelled at ICP (then three years old) using expletives, used vulgar and sexual language toward the specialist, yelled at other library patrons, and was ultimately banned from the library for one year.  Respondent did not communicate with the specialist or DHHS to confirm his next visitation, and he was discharged from the supportive visitation program.

The children's foster mother testified that respondent had "[p]robably like six" visitations with the children at her home in 2023, but that respondent "slowly stopped coming at the appointment time they were supposed to be there."  Respondent did occasionally bring snacks, toys, and winter hats for the children.

Respondent's caseworker testified that respondent told her that he had been "couch surfing," i.e., living in different places, in January 2024.  Respondent's housing situation never improved; the caseworker testified that, as of the date of trial, respondent was "still bouncing between places," including staying with friends and staying at a homeless encampment in Traverse City called "the Pines."  The caseworker testified that respondent had informed her the previous week that he had been living on the street and sleeping "in a hole next to the library."  On the day of the termination trial, the caseworker picked him up from a restaurant where respondent sometimes worked; the caseworker reported that the owner was helping respondent and had recently given him a place to stay, although she was not sure of the particulars of his living situation.

Respondent reported being employed at several places, although he did not complete documentation given to him by DHHS to verify his employment.  The caseworker was able to verify that respondent had worked part-time at a landscaping company; she testified that she was told that respondent could work as many hours as he wanted, but that he "tends to show up when he wants to show up."

The caseworker testified that respondent had been referred to parenting classes, but had been dismissed from one class after approximately two months because of unexcused absences and disruptive behavior, including use of vulgar language.  He was dismissed from another parenting class due to nonattendance.  Respondent had attended some supervised visitations at the DHHS office or in the community until his parenting time was suspended in April 2024.  She testified that his parenting time had been suspended after he yelled at one of the children and hit

---

[3] As stated, the children's mother voluntarily released her parental rights to the children at the beginning of trial.

him during a visit; the twins were two and a half years old at the time. She testified that respondent had threatened DHHS workers and threatened to burn down the children's foster home.

The caseworker testified that respondent had completed a mental health evaluation and substance abuse assessment at Joy Valley Counseling in February of 2024. The report from Joy Valley recommended that respondent receive mental health services and substance abuse counseling. However, there had been difficulty getting respondent mental health services due to his "undocumented status" and insurance. The caseworker had referred him to several providers, and he was put on a wait list for at least two of them; however, the caseworker noted that respondent had changed his cellular phone number at least ten times and she was not sure if he had given these providers his new numbers. Respondent was referred to a provider that he could pay out of pocket for counseling, but he did not follow up on that referral. Respondent never attended or scheduled any substance abuse treatment (despite being referred for it by the caseworker) or verified that he had attended any support-group meetings. Respondent completed 32 random drug screens out of 137; of those 32, many were positive for marijuana, and one was positive for methamphetamine.

The trial court held that petitioner had proven at least one statutory ground for termination. Specifically the trial court found that respondent had not obtained stable housing and had not followed through or benefitted from any of the services recommended or provided to him. The trial court subsequently entered an order terminating respondent's parental rights as described. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews for clear error a trial court's determination that statutory grounds to terminate a respondent's parental rights exist. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009); MCR 3.977(K). To terminate parental rights, a trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination found in MCL 712A.19b(3) has been met. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "Only one statutory ground for termination need be established." *Id*. at 41. The reviewing court must not "substitut[e] its judgment for that of the trial court," see *In re Hall*, 483 Mich 1031, 1031; 765 NW2d 613 (2009), and should consider the trial court's special opportunity to evaluate the credibility of witnesses, MCR 2.613(C).

## III. ANALYSIS

Respondent argues that the trial court erred by finding that statutory grounds for termination of his parental rights had been proven by clear and convincing evidence. We disagree.

The trial court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). MCL 712A.19b(3) states in relevant part:

(3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

We conclude that the trial court did not clearly err by finding that the statutory grounds for termination set forth in MCL 712A.19b(3)(c)(*i*) existed.

"When a child is removed from a parent's custody, the agency charged with the care of the child is required to report to the trial court the efforts made to rectify the conditions that led to the removal of the child." *In re Plump*, 294 Mich App 270, 272; 818 NW2d 119 (2011). Reasonable efforts include the creation of a case service plan, which "means the plan developed by an agency . . . that includes services to be provided by and responsibilities and obligations of the agency and activities, responsibilities, and obligations of the parent." MCL 712A.13a(1)(d).

Termination of parental rights is proper under MCL 712A.19b(3)(c)(*i*) when 182 or more days have passed since the initial disposition order, and "the totality of the evidence amply supports that [respondent] had not accomplished any meaningful change" in the conditions that led to the adjudication, *Williams*, 286 Mich App at 272, and would not be able to rectify those conditions within a reasonable time. A respondent's failure to participate in and benefit from the services aimed at addressing the conditions that led to adjudication can necessitate the termination of the respondent's parental rights. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

In this case, on January 30, 2024, respondent entered a plea of admission to the allegation in the petition that he lacked stable and appropriate housing for the children. The trial court entered an order of adjudication taking jurisdiction over the children with respect to respondent's parental rights, and entered a dispositional order that same day. The trial court's order terminating respondent's parental rights was entered on February 13, 2025. Therefore, more than 182 days had elapsed since the entry of the initial dispositional order. MCL 712A.19b(3)(c)(*i*).

Upon respondent's adjudication, the trial court ordered that respondent comply with a case service plan requiring that he obtain and maintain appropriate housing. At the time of the termination trial, respondent had made absolutely no progress in acquiring stable and appropriate housing for the children. Although respondent argues that the record was ambiguous about his housing situation, we do not agree with that characterization of the record. At the termination hearing, a caseworker noted that the owner of a restaurant where respondent sporadically worked had been "helping" respondent and may have provided him a place to stay for the last week. However, the caseworker made it clear that this was speculation and that the worker had been given no information about respondent's living situation, even whether it was a camper or a house. There was no evidence presented from which the trial court could have concluded that respondent possessed stable housing that was appropriate for two toddler-aged children; in fact, testimony from multiple witnesses indicated that respondent was homeless and resided in either a homeless encampment or short-term stays with acquaintances ("couch surfing"). A caseworker testified that respondent had made no progress in improving his housing situation for more than a year, despite significant efforts by petitioner to address respondent's barriers to attaining permanent housing, particularly respondent's mental health and transportation issues. The record is clear that these efforts were hampered by respondent's lack of communication with petitioner and failure to follow through with any referrals or services provided. Moreover, respondent's counsel admitted at the termination hearing that there was "not a lot [he could] argue there" with regard to respondent's current housing. Although there may have been some ambiguity concerning the exact nature of respondent's housing at the time of termination, respondent did nothing to clarify it. See *Smith v Musgrove*, 372 Mich 329, 331; 125 NW2d 869 (1964) (stating that generally, any error raised on appeal must be that of the trial court; it cannot be an error "to which the aggrieved appellant has contributed by planned or neglectful omission of action on his part").

We conclude that the trial court did not clearly err by holding that the conditions that led to respondent's adjudication continued to exist. MCL 712A.19b(3)(c)(*i*); *Olive/Metts*, 297 Mich App at 40. Moreover, because respondent was essentially in the same position at the time of termination that he was when he was adjudicated, the trial court did not clearly err by holding that there was no reasonable likelihood that respondent would be able to address these conditions in a reasonable time. *Williams*, 286 Mich App at 272; *Frey*, 297 Mich App at 248.

Because only one statutory ground for termination need by proven, *Olive/Metts*, 297 Mich App at 41, we need not address in detail respondent's arguments concerning the other grounds for termination found by the trial court. We do note, however, that although respondent argues that his immigration status (which was not specified with particularity) "hindered his ability to utilize the services recommended to him," the record shows that respondent's lack of communication and cooperation with DHHS workers significantly hindered their efforts to help him overcome any difficulties caused by his immigration status. Respondent's immigration status or lack of appropriate documentation may indeed have made it more difficult for him to access services, but

the record is replete with attempts by DHHS workers to work with him on this issue, only to have their attempts end in respondent failing to show up or communicate with them for weeks at a time. Further, respondent could have shown a willingness to at least attempt to comply with his treatment plan by attending and benefiting from the services he was able to access.[4]

Respondent has not challenged the trial court's holding that termination of his parental rights was in ICP's and ACP's best interests. We accordingly affirm the trial court's termination of respondent's parental rights.

Affirmed.

/s/ Christopher P. Yates
/s/ Mark T. Boonstra
/s/ Adrienne N. Young

---

[4] We note additionally that the record does not indicate that respondent or his counsel requested additional services from petitioner to address difficulties caused by his immigration status; nor does respondent specify on appeal what additional services petitioner should have offered. Generally, the time to request additional services or accommodation is when the trial court adopts the service plan, *Frey*, 297 Mich App at 247, or when the inadequacy of the existing service plan becomes apparent, see *In re Hicks/Brown*, 500 Mich 79, 89 n 9; 893 NW2d 637 (2017).